QUINN EMANUEL URQUHART & SULLIVAN, LLP
  James R. Asperger (Bar No. 83188)
  jamesasperger@quinnemanuel.com
  865 S. Figueroa St., 10th Floor
  Los Angeles, CA 90017
  Telephone: (213) 443-3000
  Facsimile: (213) 443-3100

  Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
  Victoria F. Maroulis (Bar No. 202603)
  victoriamaroulis@quinnemanuel.com
  555 Twin Dolphin Drive, 5th Floor
  Redwood Shores, CA 94065
  Telephone: (650) 801-5000
  Facsimile: (650) 801-5100

BLACKBERRY CORPORATION
  Edward R. McGah, Jr (SBN 97719)
  Vice President, Deputy General Counsel – Litigation
  41 Ticknor Place
  Laguna Niguel, California 92677
  Telephone: (+1) 650-581-4750

Attorneys for BlackBerry Limited

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation, <br><br> Plaintiff, <br><br> v. <br><br> SNAP INC., a Delaware corporation <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO. 2:18-cv-02693

**COMPLAINT FOR PATENT INFRINGEMENT**

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff BlackBerry Limited ("BlackBerry" or "Plaintiff") hereby asserts the following claims for patent infringement against Defendant Snap Inc. ("Snap" or "Defendant"), and alleges as follows:

## SUMMARY

1.  ***BlackBerry Pioneers Mobile Messaging*** - BlackBerry has been a leading innovator in the field of mobile communications for the past 30 years, having invested substantial sums into research and development of communications technologies.  BlackBerry's innovations led to the commercialization of some of the earliest models of smartphones in the United States, enabling its users to, among other things, send and receive e-mails securely and surf the internet anytime and anywhere. These same innovations prompted the rise of the smartphone as a necessary everyday accessory for businesspersons and ordinary consumers alike.

2.  One example of BlackBerry's innovations is the BlackBerry Messenger technology, which revolutionized instant messaging by providing users with secure, user-friendly, point-to-point instant messaging on their mobile devices.  In many respects, through BlackBerry Messenger and other research and development, BlackBerry helped pioneer modern mobile messaging—secure, instant and user friendly on a mobile device.  The appeal and success of BlackBerry Messenger led consumers to consider instant messaging functionality as an integral aspect of mobile communications, resulting today in billions of people worldwide engaging in instant messaging over their mobile device.

3.  As an innovator, BlackBerry took many steps to safeguard this valuable intellectual property.  It received numerous patents protecting the cutting-edge features of its mobile phones, BlackBerry Messenger, and other communications applications that make such products secure, easy-to-use, and ultimately engaging to the end-user, thereby driving user growth and retention.

4.    Defendant has used BlackBerry's intellectual property to compete with it in the mobile messaging space.   A summary of Snap's infringing activities is presented below:



| BlackBerry's Innovations | Snap |
| --- | --- |
| **BlackBerry's U.S. Patent Nos. 8,825,084 and 8,326,327 Originally Filed 2010** | "Introducing Snap Map" June 21, 2017 |
| **BlackBerry's U.S. Patent No. 8,301,713 Originally Filed 2003** | |

COMPLAINT FOR PATENT INFRINGEMENT



5. The Patents-in-Suit cover, for example:

(a) ***Map Improvements For Mobile Devices***—improved mapping techniques to establish and maintain real time activity location information and provide

sufficient indication for user adoption;

(b) ***User Interface Improvements For Mobile Devices***—including (i) improvements in message notification techniques that streamline and optimize reception of new message notifications, and (ii) display of timestamps in a messaging user interface that provides users with appropriate temporal context for their communications without overtaking the user's screen with unnecessary information; and

(c) ***Modern Mobile Advertising Techniques***—methods for integrating advertising on mobile devices using different static and dynamic advertising content as well as time sensitive advertising.

6.   ***Defendant's Use of BlackBerry's Mobile Messaging Innovations Harms BlackBerry and Provides Undeserved Windfall to Snap***—Defendant's use of BlackBerry's inventions and infringement of the Patents-in-Suit have succeeded in diverting consumers away from BlackBerry's products and services and toward those of Defendant.  This infringement has resulted in a substantial and undeserved windfall for Defendant as these users drive Defendant's revenue.  Defendant's gain comes at BlackBerry's expense, depriving BlackBerry of revenue to which it is entitled as a result of its inventions.

7.   BlackBerry attempted to resolve this dispute without resorting to litigation.  It has been communicating with Defendant for over a year regarding its patent portfolio, including various letters, calls and an in person meeting.  Through this suit, BlackBerry seeks redress for the harm caused by Defendant's unlawful use of BlackBerry's intellectual property.

## INTRODUCTION TO BLACKBERRY

8.   For more than 30 years, BlackBerry has been a leading innovator in the mobile communications industry.  BlackBerry's cutting-edge wireless communication products and services have transformed the way people around the world connect, converse, and share digital information.

9.     BlackBerry was founded in 1984 in Waterloo, Ontario by two engineering students, Mike Lazaridis and Douglas Fregin.  In its early years, the company—then named Research In Motion ("RIM")—focused its inventive energies on wireless data transmission.

10.    From its modest beginnings more than 30 years ago, BlackBerry has gone on to offer a portfolio of award-winning products, services, and embedded technologies to tens of millions of individual consumers and organizations around the world, including governments, and educational institutions.  By transforming the way people communicate, BlackBerry laid a foundation for today's multibillion-dollar modern smartphone industry.   BlackBerry's innovations in mobile communications continue to this day through BlackBerry's award-winning software platform and devices, which enable and manage security, mobility, and communications between and among hardware, programs, mobile applications, and the Internet of Things (IoT).

11.    In the course of developing its ground-breaking mobile communications systems, BlackBerry (and the BlackBerry family of companies) has invented a broad array of new technologies that cover everything from enhanced security and cryptographic techniques, to mobile device user interfaces, interactive digital maps, instant messaging functionality, communication servers, and many other areas.   To take just one example, security posed a critical challenge for BlackBerry to address when bringing its mobile devices to market.  Commercial acceptance of such mobile devices required providing mechanisms to ensure safe and secure communications so that users and businesses could be confident that their confidential and private information stayed that way in spite of ever increasing threats.   Due to its innovative technologies, BlackBerry has been universally recognized as the gold standard when it comes to safe and secure data communications over mobile devices.

12.     Throughout its history, BlackBerry has demonstrated a commitment to innovation, including through its investments in research and development, which have totaled more than $5.5 billion over the past decade.  BlackBerry has protected the technical innovations resulting from these investments, including through seeking patent protection, and as detailed below, BlackBerry owns rights to an array of patented technologies in the United States.

13.     BlackBerry owns United States Patent Nos. 8,825,084, 8,326,327, 8,301,713, 8,209,634, 8,296,351, and 8,676,929 (collectively, the "Patents-in-Suit"). Defendant infringes the BlackBerry Patents-in-Suit by using, without authorization, BlackBerry's proprietary technology in their commercial products and services, including the Snapchat application, which Defendant markets, offers and distributes to users of mobile and other devices throughout the United States, including in this District.

14.     By this action, BlackBerry seeks to put an end to Defendant's unauthorized use of BlackBerry's patented technologies and to obtain compensation for the harm BlackBerry has suffered.

## NATURE OF THE ACTION

15.     This is a civil action for patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*

16.     Defendant has infringed and continues to infringe, and has induced and/or contributed to, and continues to induce and/or contribute to infringement of, one or more claims of BlackBerry's Patents-in-Suit at least by making, using, selling, and/or offering to sell its Snapchat application for mobile and other devices in the United States, including in this District.

17.     BlackBerry is the legal owner by assignment of the Patents-in-Suit, which were duly and legally issued by the United States Patent and Trademark Office ("USPTO").  BlackBerry seeks injunctive relief and monetary damages.

## THE PARTIES

18.     Plaintiff BlackBerry Limited is a Canadian company with its principal place of business at 2200 University Avenue East, Waterloo, Ontario, Canada N2K 0A7.  BlackBerry Limited is the owner of intellectual property rights at issue in this action.

19.     On information and belief, Defendant Snap Inc. is a Delaware corporation with a principal place of business at 63 Market Street, Venice, CA 90291.  On information and belief, Snap maintains offices in Los Angeles, California, operates and owns the websites located at www.snap.com and www.snapchat.com, and markets, offers, and distributes the Snapchat application throughout the United States, including in this District.

20.     Upon information and belief, Defendant directly and/or indirectly develops, designs, manufactures, distributes, markets, offers to sell and/or sells infringing products and services in the United States, including in the Central District of California, and otherwise purposefully directs infringing activities to this District in connection with the Snapchat application.

## JURISDICTION AND VENUE

21.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

22.     This Court has subject matter jurisdiction over the matters asserted herein under 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. §§ 271 *et seq*.

23.     This Court has personal jurisdiction over Defendant, in part because Defendant does continuous and systematic business in this District, including by providing infringing products and services to the residents of the Central District of California that Defendant knew would be used within this District, and by soliciting business from the residents of the Central District of California.  For example, Defendant is subject to personal jurisdiction in this Court because, *inter alia*, and upon information and belief, Defendant has a regular and established place of

business at its offices in the Central District of California, including the numerous properties and its headquarters in Venice and about 300,000 square feet of office space in Santa Monica,[1] and elsewhere in the State of California, and directly and through agents regularly does, solicits and transacts business in the Central District of California and elsewhere in the State of California, including through its Snapchat application, which is marketed, offered, and distributed to and utilized by users of mobile devices in this District and throughout the State of California.

24.    In particular, Defendant has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, sold, and/or imported infringing products in the State of California, including in this District, and engaged in infringing conduct within and directed at or from this District.   For example, Defendant has purposefully and voluntarily placed the Snapchat application into the stream of commerce with the expectation that this infringing product will be used in this District.   The infringing Snapchat application has been and continues to be distributed to and used in this District.   Defendant's acts cause injury to BlackBerry, including within this District.

25.    Venue is proper in this District under the provisions of 28 U.S.C. §§ 1391 and 1400(b) at least because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and because Defendant has committed acts of infringement in this District and has a regular and established place of business in this District.   In particular, on information and belief, Defendant

---

[1]   *See* https://investor.snap.com/company-profile; https://www.snap.com/en-US/news/page/2/ ("We have one HQ, in Venice, and many offices throughout the world."); http://www.latimes.com/business/technology/la-fi-tn-snapchat-santa-monica-20170106-story.html.

has a regular and established place of business at 63 Market Street, Venice, CA 90291.[2]

## FACTS COMMON TO ALL CLAIMS

### BlackBerry's Innovation and Industry Recognition

26.    BlackBerry is a global leader in the mobile communications industry. Through its significant investment in research and development over the past 30 years, BlackBerry has developed innovative, cutting-edge technologies that have changed the face of telecommunications.  In particular, BlackBerry has developed key innovations in the way mobile devices and communications software interact with and receive input from users.  BlackBerry's innovations in messaging and UI development improved the speed and accuracy with which users could perform various tasks on their mobile devices.

27.    In the late 1990s, BlackBerry began to release a series of game-changing handheld mobile devices that enabled users to send and receive email and messages on the go, without needing to be tethered to a modem or a desktop computer.  The innovative nature of the 1998 RIM 950 Wireless Handheld, for example, was instantly recognized, garnering both an Editor's Choice Award from CNET and Andrew Seybold's Outlook Award.  In particular, the press praised the RIM 950's keyboard for its advanced ergonomic features, including an easy-to-type-on keyboard layout despite the device's miniature size.

28.    In 2002, BlackBerry released the BlackBerry 6710 and 6720 – the first BlackBerry devices capable of both sending emails and making phone calls, and some of the earliest smartphones released in the United States.  The next year, BlackBerry introduced smartphone models that added built-in audio hardware and color screens.  Since those early smartphones, BlackBerry has continued to offer

---

[2]   *See* https://investor.snap.com/company-profile; https://www.snap.com/en-US/news/page/2/ ("We have one HQ, in Venice, and many offices throughout the world.").

handheld wireless products incorporating its proprietary technologies in security, communications, mobile device user interfaces, and other areas.

29.    In 2005, BlackBerry introduced the innovative BlackBerry Messenger (or "BBM") application, which revolutionized the concept of instant messaging. BBM provided the first form of point-to-point communications that was instant, cross-carrier, and mobile. The developers of BBM further incorporated a well-designed graphical user interface and other innovative features not utilized by messaging platforms at that time.  For example, BBM has been credited as the first messaging platform to enable status updates showing when messages were Delivered and Read by users, which created a pioneering sense of real-time presence that is now standard in many instant messaging applications.  Additionally, BBM's unique platform has allowed users to communicate even when traditional forms of cell communication were incapacitated, such as during the Chilean earthquake in 2010.[3]

30.    Over the years, BlackBerry continued to develop and improve successive versions of BBM by introducing features such as GPS positioning and digital maps, connected applications, voice chat, private chat, and many other features.  As a result, BBM has been widely downloaded and is popular among users of all platforms, including Android and iOS.  Indeed, more than 5 million people downloaded BBM within 8 hours of the release of its Android and iOS versions in October 2013.  By March 4, 2015, the Android version of BBM had reached 100 million Google Play installs.  BBM also enjoys strong user loyalty, with studies finding that 82% of BBM's Android users continue using the application 90 days after installation.

---

[3] *See, e.g.*, https://www.cio.com/article/2420175/blackberry-phone/blackberry-messenger--bbm--keeps-chilean-quake-affected-connected.html; http://www.nytimes.com/2001/09/20/technology/the-right-connections-the-simple-blackberry-allowed-contact-when-phones-failed.html.

31.     Each successive iteration of BlackBerry's wireless devices and technologies have received significant unsolicited coverage in the media.   For example, GSMA—the largest and most well-known association of mobile operators—recognized BlackBerry and its communication technologies as "chang[ing] the face of corporate communication." Thomson Reuters named BlackBerry one of the World's Top 100 Most Innovative Organizations, based largely on the number of "important patents" owned by BlackBerry.   In 2015, Forrester Research crowned BlackBerry as a "leader in mobile management" based on BlackBerry's focus in security software and mobile solutions.

32.     BlackBerry's handheld devices and communications technologies have garnered widespread industry acclaim for both their unique design and their performance. For example, BlackBerry mobile devices have garnered dozens of industry awards, including the GSMA Chairman's Award, InfoWorld Magazine's Product of the Year Award, PC World's World Class Award, the Network Industry Award for Best New Mobile Communications Product, the BusinessWeek Best Product of the Year Award, Digit Magazine's "World's Best Mobile OS" Award, Security Products "Govies" Government Security Award, and PC Magazine's Best Products of the Year Award.   BBM in particular has been recognized for its innovations in mobile messaging, being awarded "Superstar" distinction from the 2014 Mobile Star Awards in the Mobile Messaging or Email category, the Indonesia Golden Ring Award for Best Mobile Social Media, and the ICA 2014 Award for Best Mobile Chat App.

33.     BlackBerry's more recent innovations have garnered similar industry acclaim.   For example, in 2015 BlackBerry's Passport was awarded the prestigious Red Dot "Best of the Best" award for innovative product design (from thousands of total entries); BlackBerry and BBM were recognized with the Mobile Marketing Association's "Smartie" Award for 2015 Publisher/Media Company of the Year in

Mobile; and BlackBerry's PRIV was awarded the Red Dot "Design Award" for best product design in 2016.

## BlackBerry's Patents

34.     U.S. Patent No. 8,825,084 ("'084 Patent") is entitled "System and method for determining action spot locations relative to the location of a mobile device," and was issued on September 2, 2014.  A true and correct copy of the '084 Patent is attached as Exhibit A.

35.     The '084 Patent was filed on October 9, 2012 as U.S. Patent Application No. 13/648,167 as a continuation of application No. 12/870,676 filed on Aug. 27, 2010, which issued as U.S. Patent No. 8,326,327.

36.     BlackBerry Limited is the owner of all rights, title, and interest in and to the '084 Patent, with the full and exclusive right to bring suit to enforce the '084 Patent, including the right to recover for past infringement.

37.     The '084 Patent is valid and enforceable under United States Patent Laws.

38.     U.S. Patent No. 8,326,327 ("'327 Patent") is entitled "System and method for determining action spot locations relative to the location of a mobile device," and was issued on December 4, 2012.  A true and correct copy of the '327 Patent is attached as Exhibit B.

39.     The '327 Patent was filed on August 27, 2010 as U.S. Patent Application No. 12/870,676.

40.     BlackBerry Limited is the owner of all rights, title, and interest in and to the '327 Patent, with the full and exclusive right to bring suit to enforce the '327 Patent, including the right to recover for past infringement.

41.     The '327 Patent is valid and enforceable under United States Patent Laws.

42.     U.S. Patent No. 8,301,713 ("'713 Patent") is entitled "Handheld electronic device and associated method providing time data in a messaging

environment," and was issued on Oct. 30, 2012.  A true and correct copy of the '713 Patent is attached as Exhibit C.

43.     The '713 Patent was filed on May 19, 2011 as U.S. Patent Application No. 13/111,675, claims priority to U.S. Provisional Application No. 60/504,379 filed on Sep. 19, 2003, and is a continuation of U.S. Patent Application No. 10/944,925 filed Sep. 20, 2004, which issued as U.S. Patent No. 7,970,849.

44.     BlackBerry Limited is the owner of all rights, title, and interest in and to the '713 Patent, with the full and exclusive right to bring suit to enforce the '713 Patent, including the right to recover for past infringement.

45.     The '713 Patent is valid and enforceable under United States Patent Laws.

46.     U.S. Patent No. 8,209,634 ("'634 Patent") is entitled "Previewing a new event on a small screen device," and was issued on Jun. 26, 2012.  A true and correct copy of the '634 Patent is attached as Exhibit D.

47.     The '634 Patent was filed on Feb. 24, 2004 as U.S. Patent Application No. 10/784,781 and claims priority to U.S. Provisional Appl. No. 60/525,958 filed Dec. 1, 2003.

48.     BlackBerry Limited is the owner of all rights, title, and interest in and to the '634 Patent, with the full and exclusive right to bring suit to enforce the '634 Patent, including the right to recover for past infringement.

49.     The '634 Patent is valid and enforceable under United States Patent Laws.

50.     U.S. Patent No. 8,296,351 ("'351 Patent") is entitled "System and method for pushing information to a mobile device," and was issued on October 23, 2012.  A true and correct copy of the '351 Patent is attached as Exhibit E.

51.     The '351 Patent was filed on March 18, 2010 as U.S. Patent Application No. 12/726,405 and claims priority to, *inter alia*, U.S. Provisional Appl. No. 60/307,265 filed July 23, 2001.

52.    BlackBerry Limited is the owner of all rights, title, and interest in and to the '351 Patent, with the full and exclusive right to bring suit to enforce the '351 Patent, including the right to recover for past infringement.

53.    The '351 Patent is valid and enforceable under United States Patent Laws.

54.    U.S. Patent No. 8,676,929 ("'929 Patent") is entitled "System and method for pushing information to a mobile device," and was issued on March 18, 2014.  A true and correct copy of the '929 Patent is attached as Exhibit F.

55.    The '929 Patent was filed on September 13, 2012 as U.S. Patent Application No. 13/614,884 and claims priority to, *inter alia*, U.S. Provisional Appl. No. 60/307,265 filed July 23, 2001.

56.    BlackBerry Limited is the owner of all rights, title, and interest in and to the '929 Patent, with the full and exclusive right to bring suit to enforce the '929 Patent, including the right to recover for past infringement.

57.    The '929 Patent is valid and enforceable under United States Patent Laws.

## Defendant's Use of BlackBerry's Patented Technologies

58.    On information and belief, Defendant released the Snapchat application in September, 2011, more than six years after BlackBerry's release of BlackBerry Messenger ("BBM").[4]

59.    By the time Defendant released the first (and simplest) version of its messaging app, BlackBerry had already invented most of the technologically innovative messaging application functionalities at issue in this action.  Indeed, some of these innovations were already being utilized by users of BlackBerry's smartphones, which represented more than half of the U.S. market in 2009 and came

---

[4]  *See, e.g.*, https://www.forbes.com/sites/jjcolao/2012/11/27/snapchat-the-biggest-no-revenue-mobile-app-since-instagram/#11e04b967200

with BBM installed.[5]  Industry commentators at the time noted the success of BBM, including with consumer audiences such as "[t]eens, for instance, [who] love BlackBerry Messenger, RIM's proprietary instant messaging feature."  *See* http://archive.fortune.com/2009/08/12/technology/blackberry_research_in_motion.fortune/index.htm.  The consumer demand and appreciation for BlackBerry's innovative messaging application functionalities was further evidenced in 2013, when BlackBerry released the first versions of BBM for Apple's iOS and Google's Android mobile device platforms and recorded over 5 million downloads of BBM within the first 8 hours of being made available.  *See* https://9to5mac.com/2013/10/21/blackberry-announces-5-million-downloads-of-bbm-for-ios-and-android-only-8-hours-after-release/.  In just two years, BBM had been installed in over 100 million Android devices alone.  *See* http://blogs.blackberry.com/2015/03/bbm-hits-100m-google-play-installs/.

60.    Seizing on the success of BBM and demand for consumer messaging platforms featuring BlackBerry's innovative features and functionalities, Defendant developed and released its infringing Snapchat application and products, which incorporate and unlawfully utilize BlackBerry's patented technologies.

61.    On information and belief, Defendant markets, offers, and distributes the infringing Snapchat application in and within the United States, including through distribution platforms such as the Apple iTunes Application Store and the Google Android Play Store.

62.    On information and belief, the accused Snapchat application is Defendant's primary product in the United States.

63.    On information and belief, Defendant encourage users of mobile devices such as iPhones and Android phones in the United States to download and use the infringing Snapchat application, and such mobile device users do so

---

[5]  *See* http://money.cnn.com/2009/06/17/technology/rim_blackberry_preview/.

download and use the infringing apps in the manner Defendant intends the application to be used.

64.     On information and belief, Defendant has also designed, developed, tested, and used the infringing apps in and within the United States.

## BlackBerry Put Defendant on Notice of Infringement for Various of the Patents-in-Suit

65.     Through a series of letters, e-mails, a meeting and personal communications between the parties' general counsels, BlackBerry provided Defendant with clear and unambiguous notice that its products infringe BlackBerry's messaging patents, including some of the Patents-in-Suit.

66.     BlackBerry sent a letter to Defendant's General Counsel on January 27, 2017, informing Defendant that the "Snapchat Software application" infringes the '713 and '634 Patents. *See* Ex. G.  BlackBerry again identified the '713 and '634, Patents during a meeting between BlackBerry and Defendants concerning possible licensing of the patents on June 21, 2017.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 8,825,084

67.     BlackBerry incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

## The '084 Patent

68.     The '084 Patent discloses, among other things, a system, server, mobile device, and method for determining an action spot location.  '084 Patent at Abstract. An action spot location can be determined relative to the location of a first mobile device and can represent, for example, a location where at least one other mobile device "has engaged in documenting action within a predetermined period of time" from when the first mobile device arrived at its current location.  *Id.*

69.     The '084 Patent explains that "[w]hen devices are enabled for navigational functions, mobile devices can retrieve and display maps and directions to locations relative to the current location of the mobile device.  Typically, the

maps are limited in information.  For example, maps are limited to displaying the streets within a city." *Id*. at 3:6-11.  The limited amount of information displayed means that, "[i]n order to find information relating to events and happenings currently occurring proximate to the mobile device's present location, the user of the mobile device will have to search an external resource, such as an electronic events calendar, internet sites, internet calendars of individual business or event holders (stores, restaurants, concert venues, bars, etc.), and compare the locations of the found events and happenings to the mobile device's current location." *Id*. at 3:11-19.

70.   As the '084 Patent notes, "[s]uch a process of manually researching events and happenings, determining the location of the events and happenings, and comparing the location of the events and happenings to the user's current location is tedious and results in user frustration.  Moreover, the results of the user's research of current events and happenings can be incomplete and inaccurate, and the user can miss certain happenings that are close in proximity to the current location of the user's mobile device." *Id*. at 3: 19-27.

71.   To solve this problem, the '084 Patent discloses a technique for "determining action spot locations relative to the location of a mobile device." *Id*. at 3:28-30.  These "action spots" can represent locations or events where at least one other mobile device is engaging in activity that can include "a documenting action (such as text messaging, emailing, blogging, posting a message on a social networking internet site, or any other documenting actions), a recording action (such as video recording, audio recording, or photographing taken by a mobile device) or any other action where the mobile device is being used to observe and make not of a location or an event currently occurring at the location of the mobile device." *Id*. at 2:61-3:5.

72.   The Patent describes how a server "can monitor and log where other mobile devices are capturing images, capturing videos, or transmitting messages,

such as text messages, instant messages, virtual posts, or any combination thereof, and identify the locations as action spots," which can then be displayed on the graphical user interface of a mobile device. *Id.* at 7:16-34. Figure 3 of the '084 Patent illustrates an exemplary implementation of a graphical user interface



associated with the invention, with an interactive map on a mobile device display capable of displaying various action spots representing documenting activity:

73.     The '084 Patent goes on to describe how colors may be used on the map to provide the user with information about the level and density of documenting activity. The Patent explains that "[t]he level of activity associated with the action spot 304, 306 can also be represented by varying the colors of the graphical items representing the action spots 304, 306. For example, a graphical item that is yellow can represent a moderate amount of documenting action; while a graphical item of green represents a large amount of documenting action, and thus an increased likelihood that the action spot associated with a green graphical item is a more happening location, a more popular location, or a location where a large number of people have gathered to witness and document a current event or happening. In other words, the indication of the level of activity includes coloring

the graphical item in accordance with a range of activity occurring at the at least one action spot, 304, 306." *Id*. at 6:45-59.

74.     Thus, the '084 Patent describes, *inter alia*, "[a] server configured to: receive data indicative of a current location of a first mobile device; determine at least one action spot within a predetermined distance from the current location of the first mobile device, the at least one action spot corresponding to a location where at least one second mobile device has engaged in at least one documenting action, the documenting action including at least one of capturing images, capturing videos and transmitting messages; transmit the at least one action spot to the first mobile device; and transmit to the first mobile device, an indication of an activity level at the at least one action spot, wherein the activity level is based upon at least one of a number of images captured, a number of videos captured, and a number of messages transmitted." *Id*. at claim 1.

### The Inventions Claimed in the '084 Patent Were Not Well-Understood, Routine, or Conventional

75.     A server configured to receive data indicative of a current location of a mobile device and determine an indication of activity level within a predetermined distance from the current location of the mobile device based on surrounding documenting actions of other mobile devices was not common or conventional at the time of the '084 Patent.

76.     The inventors of '084 Patent recognized that, in certain mobile device contexts where the devices can retrieve and display maps and directions based on user location, the maps and directions typically comprise only information regarding events and happenings occurring proximate to the user's current location. '084 Patent at 3:6-27. The inventors also recognized that in some circumstances this information may be desirable, but "[s]uch a process of manually researching events and happenings, determining the location of the events and happenings, and comparing the location of the events and happenings to the user's current location is

tedious and results in user frustration. Moreover, the results of the user's research of current events and happenings can be incomplete and inaccurate, and the user can miss certain happenings that are close in proximity to the current location of the user's mobile device." *Id*. at 3:19-27.

77.    The inventors recognized the benefit of solving this problem by providing a system and method of determining action spot locations based on an activity level of other mobile devices relative to the location of a mobile device. The '084 Patent explains:   "[i]n one implementation, a mobile device includes a display and a processor module communicatively coupled to the display. The processor can be configured to receive executable instructions to: determine a current location of the mobile device; determine at least one action spot, within a predetermined distance from the current location of the mobile device; signify the at least one action spot with a graphical item on the display of the mobile device; marking the graphical item according to an activity level of the at least one action spot." *Id*. at 3:28-42.  In this manner, the '084 Patent discloses an improved mobile device that is able to provide an accurate indication of activity within a predetermined distance of the location of the device.  At the time of the '084 Patent, mobile device maps and directions were static and lacked dynamic information relating to the surrounding location of a user.  The '084 patent thus discloses an improvement on the functioning of a mobile device.

78.    Given the state of the art at the time of the invention of the '084 Patent, the inventive concepts of the '084 Patent were not conventional, well-understood, or routine.   The '084 Patent discloses, among other things, an unconventional technological solution to an issue arising specifically in the context of electronic communications between electronic devices.  The solution implemented by the '084 Patent provides a specific and substantial improvement over prior electronic messaging systems in electronic devices, including by introducing novel elements directed to improving the function and working of electronic devices such as, *inter*

*alia*, the claimed "determine at least one action spot within a predetermined distance from the current location of the first mobile device, the at least one action spot corresponding to a location where at least one second mobile device has engaged in at least one documenting action, the documenting action including at least one of capturing images, capturing videos and transmitting messages; transmit the at least one action spot to the first mobile device; and transmit to the first mobile device, an indication of an activity level at the at least one action spot" (claim 1).

79.     Consistent with the problem addressed being rooted in wireless communication to mobile devices, the '084 Patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind. This technical context is reflected in the '084 Patent's claims, as described above.

80.     A person having ordinary skill in the art at the time of the inventions of the '084 Patent would not have understood that the inventions could or would be performed solely in the human mind or using pen and paper.  Using pen and paper would ignore the stated purpose of the '084 Patent and the problem the patented technology was specifically designed to address.  Doing so would also run counter to the inventors' detailed description of the inventions, and the language of the claims, and be a practical impossibility.

### '084 Patent Allegations

81.     Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, the '084 Patent in violation of 35 U.S.C. § 271 *et seq*., directly and/or indirectly, by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Snapchat application and servers associated with its operation (hereinafter "the '084 Accused Products") that infringe at least claims 1 and 9 of '084 Patent.

82.     On information and belief after reasonable investigation, the '084 Accused Products contain functionality designed to identify documenting activity by

mobile devices, to transmit information about that activity to a user's mobile device, and to cause that information to be displayed on an interactive map on the display of the user's mobile device in a manner that indicates the nature and level of that activity by, for example, displaying a color-coded "heat map" indicative of the level of that activity.  This functionality infringes the '084 Patent.

83.     One non-limiting description of this infringement is set forth below for exemplary claim 1 of the '084 Patent (with claim language in italics).  This description is based entirely on publicly available information.  BlackBerry reserves the right to modify this description, including, for example, based on information about the '084 Accused Products that it obtains during discovery.

84.     On information and belief, the '084 Accused Products include *a server configured to*: *receive data indicative of a current location of a first mobile device*. *See* https://support.snapchat.com/en-US/article/ios-permissions (describing how Snapchat users can share the mobile device location information to use its features: "Use your location for features like Geofilters and Our Stories, and for other services that improve your experience.").

85.     On information and belief, the '084 Accused Products include servers that are also configured to: *determine at least one action spot within a predetermined distance from the current location of the first mobile device, the at least one action spot corresponding to a location where at least one second mobile device has engaged in at least one documenting action, the documenting action including at least one of capturing images, capturing videos and transmitting messages* and to *transmit the at least one action spot to the first mobile device*.



86.     This functionality is displayed in Snapchat's "Snap Map" feature, which records documenting activity including messages, photos, and videos ("Snaps") from users' mobile devices and allows them to be viewed within the application. *See* https://support.snapchat.com/en-US/a/snap-map-about ("On Snap Map, you can view Snaps submitted to Our Story from all across the world — including sporting events, celebrations, breaking news, and more. You and your friends can also share your locations with one another, and see what's going on around you.").

87.     On information and belief, the '084 Accused Products include servers that are also configured to: *transmit to the first mobile device, an indication of an activity level at the at least one action spot, wherein the activity level is based upon at least one of a number of images captured, a number of videos captured, and a number of messages transmitted.*



88.     The Snap Map functionality directly incorporates this feature, displaying activity level-based, color-coded heat maps indicative of the level and density of documenting activity by other Snapchat users.  *See* https://support.snapchat.com/en-US/a/snap-map-about ("Just tap on the heatmap to view Snaps from that area; blue means that there were some Snaps taken at that spot, while red means there are tons.").

89.     The Accused Products thus infringe the '084 Patent.

90.     Additionally, Defendant has been, and currently is a contributory infringer of the '084 Patent under 35 U.S.C. § 271(c).

91.     Upon information and belief, Defendant knew of the '084 Patent, or should have known of the '084 Patent but was willfully blind to its existence. Upon information and belief, Defendant has had actual knowledge of the '084 Patent, and its infringement thereof, since at least as early as the filing and/or service of this Complaint.

92.     Defendant contributorily infringes at least claims 1 and 9 of the '084 Patent by providing the '084 Accused Products and/or software components thereof, that embody a material part of the claimed inventions of the '084 Patent, that are known by Defendant to be specially made of adapted for use in an infringing manner, and are not staple articles with substantial non-infringing uses.  The '084 Accused Products are specially designed to infringe at least claims 1 and 9 of the '084 Patent, and their accused components have no substantial non-infringing uses. In particular, on information and belief, the software modules and code that implement and perform the infringing functionalities identified above are specially made and adapted to carry out said functionality and do not have any substantial non-infringing uses.

93.     Additional allegations regarding Defendants' knowledge of the '084 Patent and willful infringement will likely have further evidentiary support after a reasonable opportunity for discovery.

94.     Defendant's infringement of the '084 Patent was and continues to be willful and deliberate, entitling BlackBerry to enhanced damages and attorneys' fees.

95.     Defendant's infringement of the '084 Patent is exceptional and entitles BlackBerry to attorneys' fees and costs incurred in prosecuting this action under U.S.C. § 285.

96.     BlackBerry has been damaged by Defendant's infringement of the '084 Patent and will continue to be damaged unless Defendant is enjoined by this Court. BlackBerry has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.  The balance of hardships favors BlackBerry, and public interest is not disserved by an injunction.

97.     BlackBerry is entitled to recover from Defendant all damages that BlackBerry has sustained as a result of Defendant's infringement of the '084 Patent, including without limitation lost profits and not less than a reasonable royalty.

## COUNT II: INFRINGEMENT OF U.S. PATENT NO. 8,326,327

98.     BlackBerry incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

### The '327 Patent

99.     The '327 Patent issued from the parent application of the '084 Patent. As such, the '327 Patent contains the same disclosure and specification as the '084 Patent, described above.

### The Inventions Claimed in the '327 Patent Were Not Well-Understood, Routine, or Conventional

100.    The '327 Patent issued from the parent application of the '084 Patent. As such, the '327 Patent contains the same disclosure and specification.  For the same reasons described above, the invention described in the '327 patent were not well-understood, routine, or conventional.

101.    For example, the '327 Patent discloses, among other things, an unconventional technological solution to an issue arising specifically in the context of electronic communications between electronic devices.   The solution implemented by the '327 Patent provides a specific and substantial improvement over prior electronic messaging systems in electronic devices, including by introducing novel elements directed to improving the function and working of electronic devices such as, *inter alia*, the claimed "receive data indicative of a current location of the mobile device; determine at least one action spot within a predetermined distance from the current location of the mobile device, the at least one action spot corresponding to a location where at least one other mobile device has engaged in documenting action within a predetermined period of time; signify the at least one action spot on the graphical user interface; [and] provide an indication of activity level at the at least one action spot." (claim 1).

102.    Consistent with the problem addressed being rooted in user interfaces for electronic messaging between wireless communications devices, the '327

Patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind.

103.   This technical context is reflected in the '327 Patent's claims.   For example, various claims of the '327 Patent require a graphical user interface, a processor, and a mobile device.

104.   A person having ordinary skill in the art at the time of the inventions of the '327 Patent would not have understood that the inventions could or would be performed solely in the human mind or using pen and paper.   Using pen and paper would ignore the stated purpose of the '327 Patent and the problem the patented technology was specifically designed to address.   Doing so would also run counter to the inventors' detailed description of the inventions and the language of the claims and be a practical impossibility.

### '327 Patent Allegations

105.   Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, the '327 Patent in violation of 35 U.S.C. § 271 *et seq*., directly and/or indirectly, by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Snapchat application and servers associated with its operation (hereinafter "the '327 Accused Products") that infringe at least claims 1, 10, and 13 of '327 Patent.

106.   On information and belief after reasonable investigation, the '327 Accused Products contain functionality designed to identify documenting activity by mobile devices, to transmit information about that activity to a user's mobile device, and to cause that information to be displayed on an interactive map on the display of the user's mobile device in a manner that indicates the nature and level of that activity by, for example, displaying a color-coded "heat map" indicative of the level of that activity.   This functionality infringes the '327 Patent.

107.   One non-limiting description of this infringement is set for below for exemplary claim 13 of the '327 Patent (with claim language in italics).   This

description is based entirely on publicly available information.  BlackBerry reserves the right to modify this description, including, for example, based on information about the '327 Accused Products that it obtains during discovery.

108.   On information and belief, the '327 Accused Products are configured to perform *a method for providing action spots on a mobile device comprising: determining, via a processor, a current location of the mobile device*.  *See* https://support.snapchat.com/en-US/article/ios-permissions (describing how Snapchat users can share the mobile device location information to use its features: "Use your location for features like Geofilters and Our Stories, and for other services that improve your experience.").

109.   On information and belief, the '327 Accused Products are also configured to perform: *determining at least one action spot within a predetermined distance from the current location of the mobile device, the at least one action spot corresponding to a location where at least one other mobile device has engaged in documenting action within a predetermined period of time*.  This functionality is displayed in Snapchat's "Snap Map" feature, which records documenting activity including messages, photos, and videos ("Snaps") from users' mobile devices and allows them to be viewed within the application.  *See* https://support.snapchat.com/en-US/a/snap-map-about ("On Snap Map, you can view Snaps submitted to Our Story from all across the world — including sporting events, celebrations, breaking news, and more. You and your friends can also share your locations with one another, and see what's going on around you.").



110.   On information and belief, the '327 Accused Products are also configured to perform: signifying the at least one action spot with a graphical item on a display of the mobile device; marking the graphical item according to an activity level with at least one action spot.  The Snap Map functionality directly incorporates this feature, displaying activity level-based, color-coded heat maps indicative of the level and density of documenting activity by other Snapchat users. See https://support.snapchat.com/en-US/a/snap-map-about ("Just tap on the heatmap to view Snaps from that area; blue means that there were some Snaps taken at that spot, while red means there are tons.").



111.   The Accused Products thus infringe the '327 Patent.

112.   Additionally, Defendant has been, and currently is a contributory infringer of the '327 Patent under 35 U.S.C. § 271(c).

113.   Upon information and belief, Defendant knew of the '327 Patent, or should have known of the '327 Patent but was willfully blind to its existence.  Upon information and belief, Defendant has had actual knowledge of the '327 Patent, and its infringement thereof, since at least as early as the filing and/or service of this Complaint.

114.   Defendant contributorily infringes at least claims 1, 10, and 13 of the '327 Patent by providing the '327 Accused Products and/or software components thereof, that embody a material part of the claimed inventions of the '327 Patent, that are known by Defendant to be specially made of adapted for use in an infringing manner, and are not staple articles with substantial non-infringing uses. The '327 Accused Products are specially designed to infringe at least claims 1, 10, and 13 of the '327 Patent, and their accused components have no substantial non-

infringing uses.  In particular, on information and belief, the software modules and code that implement and perform the infringing functionalities identified above are specially made and adapted to carry out said functionality and do not have any substantial non-infringing uses.

115.   Additional allegations regarding Defendants' knowledge of the '327 Patent and willful infringement will likely have further evidentiary support after a reasonable opportunity for discovery.

116.   Defendant's infringement of the '327 Patent was and continues to be willful and deliberate, entitling BlackBerry to enhanced damages and attorneys' fees.

117.   Defendant's infringement of the '327 Patent is exceptional and entitles BlackBerry to attorneys' fees and costs incurred in prosecuting this action under U.S.C. § 285.

118.   BlackBerry has been damaged by Defendant's infringement of the '327 Patent and will continue to be damaged unless Defendant is enjoined by this Court. BlackBerry has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.  The balance of hardships favors BlackBerry, and public interest is not disserved by an injunction.

119.   BlackBerry is entitled to recover from Defendant all damages that BlackBerry has sustained as a result of Defendant's infringement of the '327 Patent, including without limitation lost profits and not less than a reasonable royalty.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,301,713

120.   BlackBerry incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

### '713 Patent Allegations

121.   The '713 Patent discloses, among other things, "[a]n improved handheld electronic device and an associated method . . . in which time data regarding certain aspects of a messaging conversation on a handheld electronic

device are made available to a user," including "in situations where an interruption has occurred during a messaging conversation." '713 Patent, Abstract.

122. The '713 Patent explains that in instant messaging conversations, where a conversation proceeds quickly, *i.e.*, substantially without interruption, there is no need to provide a time stamp for each individual message. *Id.* at 1:54-58. The patent states that, therefore, "[i]n the environment of a handheld electronic device, it would be desirable to avoid unnecessary time stamps and other unnecessary output since it occupies too much valuable space on the limited display of the handheld electronic device. In some messaging circumstances, however, it may be desirable for information regarding certain timing aspects of conversation to be available to a user." *Id.* at 1:59-65.

123. Fig. 4 of the '713 Patent shows an exemplary instant messaging conversation according to the patent that includes "a plurality of incoming messages 72 and a plurality of outgoing messages 76 that are transmitted between the devices 4 and 104 at a conversational speed, *i.e.*, at a speed in which back-to-back communications between the devices 4 and 104 occur without a meaningful delay there between. Due to the conversational speed of the back-to-back communications, the messages 68 do not include an indication of the times at which such messages 68 were transmitted, it being assumed as a general matter that in such circumstances the specific time at which a given message within such a conversation occurred may not be of significance to a user." *Id.* at 5:11-22. In the disclosed embodiment, a determination is made that a predetermined duration of time has transpired without a response to the most recent message in the conversation thread. *Id.* at 5:22-38. As shown in Fig. 5, in the exemplary embodiment, "another message 68 may subsequently be communicated between the devices 4 and 104. Since the message 68 corresponds with a resumption of communication between the devices 4 and 104 after a period of interruption, the message 68 is determined to be a resumption message 88, and . . . time stamp 92 is output adjacent the resumption

message 88." *Id*. at 5:62-6:2.




124. The '713 Patent thus describes, *inter alia,* "[a] method of operating an electronic device, the method comprising: outputting an electronic conversation comprising a plurality of indications, each indication being representative of at least a portion of a corresponding messaging communication between the electronic device and a second electronic device; identifying a first messaging communication between the electronic device and the second electronic device occurring at a first time, the first messaging communication having a corresponding first indication representative of at least a portion of the first messaging communication and which is one of the plurality of indications; determining that a predetermined duration of time has elapsed since the first time without additional communication between the electronic device and the second electronic device during that duration of time; detecting an input to the electronic device following said identifying and determining steps, said input occurring at a second time; and responsive to said detecting an input, outputting in the electronic conversation, a time stamp representative of the second time." *Id*. at claim 1.

### The Inventions Claimed in the '713 Patent Were Not Well-Understood, Routine, or Conventional

125. An electronic device displaying a time stamp associated with an input based on a determination that a predetermined duration of time has elapsed since a first messaging communication without additional communication between the device and another electronic device was not common or conventional at the time of

the '713 Patent.

126. The inventors of '713 Patent recognized that, in certain instant messaging conversations where the conversation proceeds quickly, it is not necessary and can be a nuisance to include a time stamp with each message and that "it would be desirable to avoid unnecessary time stamps and other unnecessary output since it occupies too much valuable space on the limited display of the handheld electronic device." '713 Patent at 1:59-62. The inventors also recognized that in some circumstances it may be desirable for information regarding timing aspects to be available to the user, but that "the limited space available on a display of a handheld electronic device has made a solution difficult." *Id*. at 1:63-67.

127. The inventors recognized the benefit of solving this problem by providing a method of outputting a time stamp associated with a messaging conversation on an electronic device responsive to a determination that a predetermined period of time has elapsed without response after a first communication. The '713 Patent explains: "[t]he general nature of the method can be stated as including determining that a first messaging communication has occurred at a first time between the first device and the second device, outputting a first indication that is representative of at least a portion of the first communication, determining that a predetermined period of time has elapsed since the first time substantially without further communication between the first device and the second device and, responsive to determining that a predetermined period of time has elapsed, outputting a first time stamp representative of the first time." *Id*. at 2:35-45. In this manner, the '713 Patent is able to strike a desirable balance between displaying sufficient timestamps to provide context for messages in a conversation without taking up too much of a mobile device's display screen. At the time of the '713 Patent, timestamps were typically displayed for every message in a conversation or not at all.

128. Given the state of the art at the time of the invention of the '713 Patent,

the inventive concepts of the '713 Patent were not conventional, well-understood, or routine. The '713 Patent discloses, among other things, an unconventional technological solution to an issue arising specifically in the context of electronic communications between electronic devices. The solution implemented by the '713 Patent provides a specific and substantial improvement over prior electronic messaging systems in electronic devices, including by introducing novel elements directed to improving the function and working of electronic devices such as, *inter alia*, the claimed "[determining / determine] that a predetermined duration of time has elapsed since the first time without additional communication between the electronic device and the second electronic device during that duration of time; [detecting / detect] an input to the electronic device following said identifying and determining steps, said input occurring at a second time; and responsive to said detecting an input, [outputting / output] in the electronic conversation, a time stamp representative of the second time" (claims 1, 5, and 9).

129.   Consistent with the problem addressed being rooted in user interfaces for electronic messaging between wireless communications devices, the '713 Patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind.

130.   This technical context is reflected in the '713 Patent's claims. For example, various claims of the '713 Patent require an electronic device, an electronic conversation, a messaging communication between the electronic device and a second electronic device, and a display.

131.   A person having ordinary skill in the art at the time of the inventions of the '713 Patent would not have understood that the inventions could or would be performed solely in the human mind or using pen and paper. Using pen and paper would ignore the stated purpose of the '713 Patent and the problem it was specifically designed to address. Doing so would also run counter to the inventors' detailed description of the inventions and the language of the claims and be a

practical impossibility.

## '713 Patent Allegations

132.   Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, the '713 Patent in violation of 35 U.S.C. § 271 *et seq.*, directly and/or indirectly, by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Snapchat application and associated backend servers and systems (hereinafter "the '713 Accused Products") that infringe at least claims 1, 5, and 9 of the '713 Patent.  The '713 Accused Products are non-limiting examples that were identified based on publicly available information, and BlackBerry reserves the right to identify additional infringing activities, products, and services, including, for example, on the basis of information obtained during discovery.

133.   On information and belief after reasonable investigation, the '713 Accused Products contain message time stamping functionality designed and used to provide timing information for messages between electronic devices in a manner that infringes the '713 Patent.

134.   As just one non-limiting example, set forth below (with claim language in italics) is a description of infringement of exemplary claim 1 of the '713 Patent in connection with the Snapchat application and associated backend servers and systems.  This description is based on publicly available information.  BlackBerry reserves the right to modify this description, including, for example, on the basis of information about the '713 Patent Accused Products that it obtains during discovery.

135.   *1(a) A method of operating an electronic device, the method comprising:* Defendants make and use the Snapchat application and associated backend servers and systems.  Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the claim language is met by the '713 Accused Products, as the '713 Accused Products facilitate performing a method of

operating an electronic device as further described below for the remaining claim limitations.

1(b) *outputting an electronic conversation comprising a plurality of indications, each indication being representative of at least a portion of a corresponding messaging communication between the electronic device and a second electronic device;*



Figure 8. Chat Conversation

http://online.wsj.com/public/resources/documents/SnapS1-02022017.pdf

1(c) *identifying a first messaging communication between the electronic device and the second electronic device occurring at a first time, the first messaging communication having a corresponding first indication representative of at least a portion of the first messaging communication and which is one of the plurality of indications;*



http://online.wsj.com/public/resources/documents/SnapS1-02022017.pdf

1(d) determining that a predetermined duration of time has elapsed since the first time without additional communication between the electronic device and the second electronic device during that duration of time; 1(e) detecting an input to the electronic device following said identifying and determining steps, said input occurring at a second time; and 1(f) responsive to said detecting an input, outputting in the electronic conversation, a time stamp representative of the second time.



136.   The Accused Products thus infringe the '713 Patent.

137.   Additionally, Defendant has been, and currently is, an active inducer of infringement of the '713 Patent under 35 U.S.C. § 271(b) and a contributory infringer of the '713 Patent under 35 U.S.C. § 271(c).

138.   Defendant knew of the '713 Patent, or should have known of the '713 Patent but was willfully blind to its existence.   Upon information and belief, Defendant has had actual knowledge of the '713 Patent since at least as early as the filing and/or service of this Complaint.   Additionally, Defendant was made aware of the '713 Patent and Defendant's infringement through a notice letter sent from BlackBerry to Snap on January 27, 2017, addressed to Defendant's General Counsel, Chris Handman.   *See* Ex. G.   In that letter, BlackBerry provided Defendant with clear notice that Defendant's Snapchat app infringed one or more claims of the

'713 Patent.   BlackBerry informed Defendant that the letter was a "Notice of Infringement" and invited Defendant "to engage in discussions" before litigation was necessary.   Upon receiving such a letter, Defendant reasonably should have investigated whether it was in fact infringing this Patent.  Had Defendant so much as read the first claim of the '713 Patent it would have immediately recognized that the Accused Products infringed at least claim 1 of the '713 Patent.  Defendant was thus provided with unambiguous and actual notice of the '713 Patent and its infringement thereof.  Defendant nevertheless continues to make, use, offer to sell, and to sell the Accused Products despite this notice and despite knowledge of its infringement.

139.   Defendant has provided the '713 Accused Products to its customers and, on information and belief, instructions to use the '713 Accused Products in an infringing manner while being on notice of or willfully blind to the '713 Patent and the Defendant's infringement.   Therefore, on information and belief, Defendant knew or should have known of the '713 Patent and of its own infringing acts, or deliberately took steps to avoid learning of those facts.

140.   Defendant knowingly and intentionally encourages and aids at least its end-user customers to directly infringe the '713 Patent.

141.   Upon information and belief, Defendant provides the '713 Accused Products to customers through various third-party application stores (e.g., the Apple Application Store) and instructions to end-user customers so that such customers will use the '713 Accused Products in an infringing manner.   For example, Defendant provides instructions to end-user customers on how to set up, configure, and use various features of the '713 Accused Products, including how to send messages.[6]

142.   Defendant's end-user customers directly infringe at least claims 1, 5, and 9 of the '713 Patent by using the '713 Accused Products in their intended

---

[6]   https://support.snapchat.com/en-US/a/chat.

manner.   Defendant induces such infringement by providing the '713 Accused Products and instructions to enable and facilitate infringement, knowing of, or being willfully blind to the existence of, the '713 Patent.   Upon information and belief, Defendant specifically intends that its actions will result in infringement of at least claims 1, 5, and 9 of the '713 Patent, or subjectively believes that its actions will result in infringement of the '713 Patent but took deliberate actions to avoid learning of those facts.

143.   Additionally, Defendant contributorily infringes at least claims 1, 5, and 9 of the '713 Patent by providing the '713 Accused Products and/or software components thereof, that embody a material part of the claimed inventions of the '713 Patent, that are known by Defendant to be specially made or adapted for use in an infringing manner, and are not staple articles with substantial non-infringing uses.   The '713 Accused Products are specially designed to infringe at least claims 1, 5, and 9 of the '713 Patent, and their accused components have no substantial non-infringing uses.   In particular, on information and belief, the software modules and code that implement and perform the infringing functionalities identified above are specially made and adapted to carry out said functionality and do not have any substantial non-infringing uses.

144.   Additional allegations regarding Defendant's knowledge of the '713 Patent and willful infringement will likely have further evidentiary support after a reasonable opportunity for discovery.

145.   Defendant's infringement of the '713 Patent was and continues to be willful and deliberate, entitling BlackBerry to enhanced damages and attorneys' fees.

146.   Defendant's infringement of the '713 Patent is exceptional and entitles BlackBerry to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

147.  BlackBerry has been damaged by Defendant's infringement of the '713 Patent and will continue to be damaged unless Defendant is enjoined by this Court. BlackBerry has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.  The balance of hardships favors BlackBerry, and public interest is not disserved by an injunction.

148.  BlackBerry is entitled to recover from Defendant all damages that BlackBerry has sustained as a result of Defendant's infringement of the '713 Patent, including without limitation lost profits and not less than a reasonable royalty.

## COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 8,209,634

149.  BlackBerry incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

## The '634 Patent

150.  The '634 Patent discloses, among other things, a "[m]ethod and apparatus for previewing new events in a computing device having a plurality of applications for managing respective events" whereby "[i]n response to a new event of a one of the applications, the application's icon is visually modified to notify of the new event."  '634 Patent at Abstract.

151.  The '634 Patent explains that "[r]epresenting multiple services and functions to a user on a single wireless mobile device presents a number of challenges to the designer of a user interface, particularly a graphical user interface (GUI), for controlling the device.  Wireless devices are usually small relative to less portable computing devices such as laptops and desktop computers. Inherently then, a visual display such as an LCD or other screen component of the wireless mobile device has a small display area."  *Id*. at 1:32-40.  The patent further explains a drawback created by the small display area of mobile devices in combination with a user's desire to operate multiple simultaneous applications on a mobile device: "When a user is notified of a new event such as a new IM message, the user is required  to  check  each  of  their  IM  service  applications  separately,  via  their

respective activation icons, to determine which IM service is responsible for the new event. Checking each service is inconvenient. Moreover, there is a demand to have information made available to a user quicker than previously available in order to optimize the control of the wireless device." *Id.* at 1:60-67.  Similarly, a user of a mobile device would face the same limitations in attempting to access multiple simultaneous conversations on the mobile device in order to determine whether there is one or many conversations responsible for the new event.

152.  Fig. 7 of the '634 Patent shows an exemplary mobile device user interface according to the patent including "a dialog box 602 for an IM application 306 having two unread messages indicated at visual modification 400." *Id.* at 8:56-58.  The Patent discloses that a count may represent the number of correspondents from which one or more messages have been received but remain unread.  *Id.* at 8:8-13.



FIG. 7

153.  The '634 Patent thus describes, *inter alia,* "[a] method of providing notifications of unread messages on a wireless communication device, comprising: displaying at least one icon relating to electronic messaging on a graphical user interface of the wireless communication device; receiving a plurality of electronic messages on the wireless communication device, the plurality of electronic

messages including messages from a plurality of different messaging correspondents; and in response to receiving at least one of the plurality of electronic messages, visually modifying at least one displayed icon relating to electronic messaging to include a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread." *Id.* at claim 1.

### The Inventions Claimed in the '634 Patent Were Not Well-Understood, Routine, or Conventional

154. A wireless communication device displaying at least one icon relating to electronic messaging on a graphical user interface, receiving a plurality of electronic messages from a plurality of different messaging correspondents, and visually modifying at least one icon to include a numeric character representing the count of the plurality of correspondents for which one or more messages remain unread was not common or conventional at the time of the '634 Patent.

155. The inventors of the '634 Patent recognized the need in wireless mobile devices "to have information made available to a user quicker than previously available in order to optimize the control of the wireless device," particularly with respect to notifications on mobile devices of new events such as new IM messages. '634 Patent at 1:65-67. The inventors further identified the benefit of solving this described problem by providing a wireless communication device with a graphical user interface wherein an icon is visually modified in response to a new event and the visual modification may comprise maintaining a count of new events. *Id.* at 2:9-28. Moreover, the '634 Patent displays a count of the number of conversations in which a new message has been received, so that the user is able to quickly determine whether the level of new messaging activity is coming from multiple conversations or a single, busy conversation.

156. Given the state of the art at the time of the invention of the '634 Patent, the inventive concepts of the '634 Patent were not conventional, well-understood, or

routine.   The '634 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of wireless communication devices and electronic messaging received within those devices. The solution implemented by the '634 Patent provides a specific and substantial improvement over prior messaging notification systems, resulting in an improved user interface for electronic devices and communications applications on those devices, including by introducing novel elements directed to improving the function and working of communications devices such as, *inter alia*, the claimed "visually modifying at least one displayed icon relating to electronic messaging to include a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread" (claims 1, 7, and 13).

157.   Consistent with the problem addressed being rooted in electronic messaging between wireless communications devices, the '634 Patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind.

158.   This technical context is reflected in the '634 Patent's claims.   For example, various claims of the '634 Patent require an electronic messaging application, plurality of electronic messages, and a wireless communication device.

159.   A person having ordinary skill in the art at the time of the inventions of the '634 Patent would not have understood that the inventions could or would be performed solely in the human mind or using pen and paper.   Using pen and paper would ignore the stated purpose of the '634 Patent and the problem it was specifically designed to address, which arose in the context of needing an improved user interface for small screen computing devices.   Doing so would also run counter to the inventors' detailed description of the inventions and the language of the claims and be a practical impossibility.

### '634 Patent Allegations

160.  Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, the '634 Patent in violation of 35 U.S.C. § 271 *et seq*., directly and/or indirectly, by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Snapchat application and associated backend servers and systems (hereinafter "the '634 Accused Products") that infringe at least claims 1, 7, and 13 of the '634 Patent. The '634 Accused Products are non-limiting examples that were identified based on publicly available information, and BlackBerry reserves the right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

161.  On information and belief after reasonable investigation, the '634 Accused Products contain user interface functionality designed and used to display and modify icons relating to electronic messages on a wireless communication device in a manner that infringes the '634 Patent.

162.  As just one non-limiting example, set forth below (with claim language in italics) is a description of infringement of exemplary claim 1 of the '634 Patent in connection with the Snapchat application.  This description is based on publicly available information. BlackBerry reserves the right to modify this description, including, for example, on the basis of information about the '634 Accused Products that it obtains during discovery.

163.  *1(a)   A method of providing notifications of unread messages on a wireless communication device, comprising:*

164.  Defendants make and use the Snapchat software application and associated backend servers and systems.  Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the claim language is met by the '634 Accused Products, as the '634 Accused Products facilitate performing a

method of providing notifications of unread messages on a wireless communications device as further described below for the remaining claim limitations.

*1(b) displaying at least one icon relating to electronic messaging on a graphical user interface of the wireless communication device;*



*1(c) receiving a plurality of electronic messages on the wireless communication device, the plurality of electronic messages including messages from a plurality of different messaging correspondents; and*



*1(d) in response to receiving at least one of the plurality of electronic messages, visually modifying at least one displayed icon relating to electronic messaging to include a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread.*



165.   The Accused Products thus infringe the '634 Patent.

166.   Additionally, Defendant has been, and currently is, an active inducer of infringement of the '634 Patent under 35 U.S.C. § 271(b) and a contributory infringer of the '634 Patent under 35 U.S.C. § 271(c).

167.   Defendant knew of the '634 Patent, or should have known of the '634 Patent but was willfully blind to its existence.   Upon information and belief, Defendant has had actual knowledge of the '634 Patent since at least as early as the filing and/or service of this Complaint.   Additionally, Defendant was made aware of the '634 Patent and Defendant's infringement through a notice letter sent from BlackBerry to Snap on January 27, 2017, addressed to Defendant's General Counsel, Chris Handman.   *See* Ex. G.   In that letter, BlackBerry provided Defendant with clear notice that Defendant's Snapchat app infringed one or more claims of the '634 Patent.   BlackBerry informed Defendant that the letter was a "Notice of Infringement" and invited Defendant "to engage in discussions" before litigation was necessary.   Upon receiving such a letter, Defendant reasonably should have investigated whether it was in fact infringing this Patent.   Had Defendant so much as read the first claim of the '634 Patent it would have immediately recognized that the Accused Products infringed at least claim 1 of the '634 Patent.   Defendant was thus provided with unambiguous and actual notice of the '634 Patent and its infringement thereof.   Defendant nevertheless continues to make, use, offer to sell, and to sell the Accused Products despite this notice and despite knowledge of its infringement.

168.   Defendant has provided the '634 Accused Products to its customers and, on information and belief, instructions to use the '634 Accused Products in an infringing manner while being on notice of or willfully blind to the '634 Patent and the Defendant's infringement.   Therefore, on information and belief, Defendant knew or should have known of the '634 Patent and of its own infringing acts, or deliberately took steps to avoid learning of those facts.

169.   Defendant knowingly and intentionally encourages and aids at least its end-user customers to directly infringe the '634 Patent.

170.  Upon information and belief, Defendant provides the '634 Accused Products to customers through various third-party application stores (e.g., the Apple Application Store) and instructions to end-user customers so that such customers will use the '634 Accused Products in an infringing manner.  For example, Defendant provides instructions to end-user customers on how to set up, configure, and use various features of the '634 Accused Products, including how to send and receive messages via the '634 Accused Products.[7]

171.  Defendant's end-user customers directly infringe at least claims 1, 7, and 13 of the '634 Patent by using the '634 Accused Products in their intended manner.  Defendant induces such infringement by providing the '634 Accused Products and instructions to enable and facilitate infringement, knowing of, or being willfully blind to the existence of, the '634 Patent.  Upon information and belief, Defendant specifically intends that its actions will result in infringement of at least claims 1, 7, and 13 of the '634 Patent, or subjectively believes that its actions will result in infringement of the '634 Patent but took deliberate actions to avoid learning of those facts.

172.  Additionally, Defendant contributorily infringes at least claims 1, 7, and 13 of the '634 Patent by providing the '634 Accused Products and/or software components thereof, that embody a material part of the claimed inventions of the '634 Patent, that are known by Defendant to be specially made or adapted for use in an infringing manner, and are not staple articles with substantial non-infringing uses.  The '634 Accused Products are specially designed to infringe at least claims 1, 7, and 13 of the '634 Patent, and their accused components have no substantial non-infringing uses.  In particular, on information and belief, the software modules and code that implement and perform the infringing functionalities identified above

---

[7]  https://support.snapchat.com/en-US/article/chat.

are specially made and adapted to carry out said functionality and do not have any substantial non-infringing uses.

173. Additional allegations regarding Defendant's knowledge of the '634 Patent and willful infringement will likely have further evidentiary support after a reasonable opportunity for discovery.

174. Defendant's infringement of the '634 Patent was and continues to be willful and deliberate, entitling BlackBerry to enhanced damages and attorneys' fees.

175. Defendant's infringement of the '634 Patent is exceptional and entitles BlackBerry to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

176. BlackBerry has been damaged by Defendant's infringement of the '634 Patent and will continue to be damaged unless Defendant is enjoined by this Court. BlackBerry has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors BlackBerry, and public interest is not disserved by an injunction.

177. BlackBerry is entitled to recover from Defendant all damages that BlackBerry has sustained as a result of Defendant's infringement of the '634 Patent, including without limitation lost profits and not less than a reasonable royalty.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 8,296,351

178. BlackBerry incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

### The '351 Patent

179. The '351 Patent discloses, among other things, a "system for pushing information to a mobile device" involving a "proxy content server," which "is coupled to [an] information source and [a] wireless network." '351 Patent at Abstract. The proxy content server "stores information received from the

information source to one of a plurality of channels based on predefined information categories, and automatically transmits information from a selected channel over the wireless network to the mobile device." *Id.*

180.   The '351 Patent teaches a proxy content server that provides targeted advertising information (*see, e.g., id*. at 4:28-46) and "aggregates existing information, such as Internet or Intranet content, from one or more Information sources, and pushes the information to a mobile device." *Id.*at 2:59-62.   This configuration "provides a method of combining the information so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content." *Id.* at 2:63-66.   The '351 Patent inventors recognized that providing targeted advertisements and content was important "to achieve a revenue source for the provider of the information so the mobile device user gets a reduce[d] or free information service." *Id*. at 3:16-19.

181.   Fig. 1 of the '351 Patent shows an exemplary network architecture according to an embodiment of the Patent for such a push notification system to improve the delivery of advertising content to mobile users.  Figure 1 illustrates "a plurality of Information Sources 10, a Proxy Content Server 18, a Proxy Content Server Database 19, and a plurality of mobile devices 24." *Id.* at 2:21-23.

COMPLAINT FOR PATENT INFRINGEMENT



FIG. 1

182.  The '351 Patent thus claims, *inter alia,* "[a] system for pushing information to a mobile device, comprising: a proxy content server that receives information over a computer network from an information source and stores the information to one of a plurality of channels based on pre-defined information categories, wherein the plurality of channels comprise memory locations included in at least one of the proxy content server or a proxy content server database; the proxy content server to receive a feedback signal over a wireless network that indicates a position of the mobile device, and to use the feedback signal to select a channel for transmission of the information from the selected channel over the wireless network to the mobile device, wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information, and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin." *Id*. at Claim 1.

## The Inventions Claimed in the '351 Patent Were Not
## Well-Understood, Routine, or Conventional

183. The use of a proxy content server to receive information over a computer network from an information source and store the information to one of a plurality of channels based on pre-defined information categories, wherein the plurality of channels comprise memory locations included in at least one of the proxy content server or a proxy content server database, and to receive a feedback signal over a wireless network that indicates the position of the mobile device and to use the feedback signal to select a channel for transmission of the information from the selected channel over the wireless network to the mobile device, wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information, and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin was not common or conventional at the time of the '351 Patent.

184. The inventors of the '351 Patent recognized the need to transmit targeted advertising, facilitated by a proxy content server, in order to deliver relevant and timely advertising information to mobile users. As taught by the '351 Patent, the "Proxy Content Server [] provides a method of combining the information so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content." *Id.* at 2:63-66.

185. Given the state of the art at the time of the invention of the '351 Patent, the inventive concepts of the '351 Patent were not conventional, well-understood, or routine. The '351 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of wireless communication devices, and the delivery of advertising content to such devices. The solution implemented by the '351 Patent provides a specific and substantial

improvement over prior wireless communication systems used for this purpose, resulting in an improved system for the delivery of relevant and timely advertising information to mobile device users.  The '351 Patent achieves this result by introducing novel elements directed to improving the function and working of wireless communication systems such as, *inter alia*, the claimed "proxy content server" (all claims), positioned in a wireless network and configured according to the claims, the capability of the proxy content server to "receive a feedback signal over a wireless network that indicates a position of the mobile device, and to use the feedback signal to select a channel for transmission of the information from the selected channel over the wireless network to the mobile device," (claims 1-13) and the capability to combine "static advertising information with one of [] dynamic or default advertising information" to result in "an advertisement or an information bulletin" (all claims).

186.  Consistent with the problem addressed being rooted in wireless communication to mobile devices, the '351 Patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind.

187.  This technical context is reflected in the '351 Patent's claims.  For example, the claims recite a "proxy content server that receives information over computer network from an information source" and which transmits information over a "wireless network" to "mobile devices."

188.  A person having ordinary skill in the art at the time of the inventions of the '351 Patent would not have understood that the inventions could or would be performed solely in the human mind or using pen and paper.  Using pen and paper would ignore the stated purpose of the '351 patent and the problem it was specifically designed to address, which arose in the context of needing an improved system for delivering content, including advertising content, from an information source to mobile users over a wireless network.  Doing so would also run counter to

the inventors' detailed description of the inventions and the language of the claims and be a practical impossibility.

## '351 Patent Allegations

189.   Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, the '351 Patent in violation of 35 U.S.C. § 271 *et seq.*, directly and/or indirectly, by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Snapchat application and associated backend servers and systems (hereinafter "the '351 Accused System") that infringes at least claims 1 and 14 of the '351 Patent.  The '351 Accused System is a non-limiting example that was identified based on publicly available information, and BlackBerry reserves the right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

190.   On information and belief after reasonable investigation, the '351 Accused System includes a proxy content server that receives information from an information source, stores the information in one of a plurality of channels, receives a feedback signal over a wireless network that indicates a position of a mobile device, uses the feedback signal to select a channel for transmission of the information over the wireless network to the mobile device, wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information, and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin.

191.   As just one non-limiting example, set forth below (with claim language in italics) is a description of infringement of exemplary claim 1 of the '351 Patent in connection with the Snapchat application.  This description is based on publicly available information. BlackBerry reserves the right to modify this description,

including, for example, on the basis of information about the '351 Accused System that it obtains during discovery.

*1(a) A system for pushing information to a mobile device, comprising:*

Defendant makes and uses Snapchat software applications and associated backend servers and systems. Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the claim language is met by the '351 Accused System, as the '351 Accused System includes a system for pushing information to a mobile device as further described below for the remaining claim limitations.

*1(b) a proxy content server that receives information over a computer network from an information source and stores the information to one of a plurality of channels based on pre-defined information categories, wherein the plurality of channels comprise memory locations included in at least one of the proxy content server or a proxy content server database;*



([https://forbusiness.snapchat.com/gettingstarted](https://forbusiness.snapchat.com/gettingstarted))

On information and belief, the "proxy content server" receives information over a computer network from advertisers and/or a server used by Snap for advertising intake. Once received, this information is stored to one of a plurality of channels comprising memory locations included in the proxy content server or a database associated with the proxy content server. The storage of the information is

based on pre-defined information categories (*i.e.*, categories corresponding to a targeted audience for the advertiser information).

    *1(c) the proxy content server to receive a feedback signal over a wireless network that indicates a position of the mobile device, and to use the feedback signal to select a channel for transmission of the information from the selected channel over the wireless network to the mobile device,*



(https://forbusiness.snapchat.com/audiences)

    *1(d) wherein the information comprises at least one of static advertising information, dynamic advertising information, default advertising information, or content information,*

COMPLAINT FOR PATENT INFRINGEMENT





(https://blog.bufferapp.com/snapchat-ad-manager#what-are-snap-ads)

*1(e) and wherein a combination of the static advertising information with one of the dynamic or default advertising information comprises an advertisement or an information bulletin.*



COMPLAINT FOR PATENT INFRINGEMENT

(https://blog.bufferapp.com/snapchat-ad-manager#what-are-snap-ads)

192.   The '351 Accused System thus infringes at least one claim of the '351 Patent.

193.   Upon information and belief, Defendant knew of the '351 Patent, or should have known of the '351 Patent but was willfully blind to its existence. Upon information and belief, Defendant has had actual knowledge of the '351 Patent, and its infringement thereof, since at least as early as the filing and/or service of this Complaint.

194.   Additional allegations regarding Defendants' knowledge of the '351 Patent and willful infringement will likely have further evidentiary support after a reasonable opportunity for discovery.

195.   Defendant's infringement of the '351 Patent was and continues to be willful and deliberate, entitling BlackBerry to enhanced damages and attorneys' fees.

196.   Defendant's infringement of the '351 Patent is exceptional and entitles BlackBerry to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

197.   BlackBerry has been damaged by Defendant's infringement of the '351 Patent and will continue to be damaged unless Defendant is enjoined by this Court. BlackBerry has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law.  The balance of hardships favors BlackBerry, and public interest is not disserved by an injunction.

198.   BlackBerry is entitled to recover from Defendant all damages that BlackBerry has sustained as a result of Defendants' infringement of the '351 Patent, including without limitation lost profits and not less than a reasonable royalty.

## COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 8,676,929

199.   BlackBerry incorporates by reference and re-alleges all of the foregoing paragraphs of this Complaint as if fully set forth herein.

**The '929 Patent**

200.  The '929 Patent issued from a continuation application stemming originally from the application giving rise to the '351 Patent.  As such, the '929 Patent contains the same disclosure and specification as the '351 Patent.

201.  The '929 Patent thus claims, *inter alia,* "[a] server, comprising: a database organized into a plurality of memory location channels, each of the memory location channels storing information of a same category as a pre-defined category of each of the respective memory location channels, wherein upon detection of a triggering event comprising a time triggering event, determining the information relevant to the detected triggering event from among information stored in one of the plurality of memory location channels of the database, when the information relevant to the detected triggering event comprises content information, inserting into the content information a meta tag for one or more advertisements to be displayed with the content information that includes the meta tag to a mobile device, wherein the meta tag identifies the one or more advertisements and advertisement display requirements, and wherein the one or more advertisements are selected based on the detected triggering event." '929 Patent at claim 1.

**The Inventions Claimed in the '929 Patent Were Not
Well-Understood, Routine, or Conventional**

202.  The use of a server to detect a time triggering event, determine information relevant to the detected time triggering event, and inserting a meta tag into content information corresponding to the detected time triggering event that identifies one or more advertisements or advertisement display requirements selected based on the detected triggering event was not common or conventional at the time of the '929 Patent.

203.  The inventors of the '929 Patent recognized that when transmitting content triggered by, for example, a time triggering event, the insertion of a meta tag into content information could further facilitate the delivery of relevant and timely

advertising information to mobile users.  As taught by the '929 Patent, the disclosed invention "provides a method of combining the information so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content."  '939 Patent at 3:1-4.

204.   Given the state of the art at the time of the invention of the '929 Patent, the inventive concepts of the '929 Patent were not conventional, well-understood, or routine.  The '929 Patent discloses, among other things, an unconventional and technological solution to an issue arising specifically in the context of wireless communication devices, and the delivery of advertising content to such devices. The solution implemented by the '929 Patent provides a specific and substantial improvement over prior communication systems used for this purpose, resulting in an improved system for the delivery of relevant and timely advertising information to mobile device users.  The '929 Patent achieves this result by introducing novel elements directed to improving the function and working of mobile communication systems such as, *inter alia*, the claimed "a server" (all claims), positioned in a wireless network and configured according to the claims, the capability of the claimed server to detect a "time triggering event" and determine information relevant to the triggering event (all claims), and the capability of inserting into content information corresponding to the time triggering event a meta tag that identifies one or more advertisements and advertisement display requirements that are selected based on the time triggering event (all claims).

205. Consistent with the problem addressed being rooted in wireless communication to mobile devices, the '929 Patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind.

206.  This technical context is reflected in the '929 Patent's claims.  For example, the claims recite "a server" that detects a "time triggering event," determines information relevant to the detected triggering event, and which

transmits information over a "wireless network" to a "mobile device" with a "meta tag" that identifies the one or more advertisements and advertisement display requirements.

207.   A person having ordinary skill in the art at the time of the inventions of the '929 Patent would not have understood that the inventions could or would be performed solely in the human mind or using pen and paper.  Using pen and paper would ignore the stated purpose of the '929 Patent and the problem it was specifically designed to address, which arose in the context of needing an improved system for delivering content, including advertising content, from an information source to mobile users over a wireless network.  Doing so would also run counter to the inventors' detailed description of the inventions and the language of the claims and be a practical impossibility.

## '929 Patent Allegations

208.   Defendant has infringed and is infringing, either literally or under the doctrine of equivalents, the '929 Patent in violation of 35 U.S.C. § 271 *et seq*., directly and/or indirectly, by making, using, selling, offering for sale, and/or importing into the United States without authority or license, the Snapchat application and associated backend servers and systems (hereinafter "the '929 Accused System") that infringes at least claims 1 and 9 of the '929 Patent.  The '929 Accused System is a non-limiting example that was identified based on publicly available information, and BlackBerry reserves the right to identify additional infringing activities, products and services, including, for example, on the basis of information obtained during discovery.

209.   On information and belief after reasonable investigation, the '929 Accused System includes a server capable of detecting a time triggering event and, based on the time triggering event, sending content information a mobile device with a "meta tag" to identify one or more advertisements and advertisement display requirements.

210.   As just one non-limiting example, set forth below (with claim language in italics) is a description of infringement of exemplary claim 9 of the '929 Patent in connection with the Snapchat application.   This description is based on publicly available information. BlackBerry reserves the right to modify this description, including, for example, on the basis of information about the '929 Accused System that it obtains during discovery.

*9(a) A server, comprising:*

Defendant makes and uses Snapchat software applications and associated backend servers and systems.  Regardless of whether the preamble of claim 1 adds any substantive limitation to the claim, the claim language is met by the '929 Accused System, as the '929 Accused System include a server comprising the elements further described below for the remaining claim limitations.

*9(b) a database organized into a plurality of memory location channels, each of the memory location channels storing information of a same category as a pre-defined category of each of the respective memory location channels,*



([https://support.snapchat.com/en-US/article/discover](https://support.snapchat.com/en-US/article/discover))

(https://forbusiness.snapchat.com/gettingstarted)

*9(c) wherein upon detection of a triggering event comprising a time triggering event, determining the information relevant to the detected triggering event from among information stored in one of the plurality of memory location channels of the database,*



(https://support.snapchat.com/en-US/article/discover)

COMPLAINT FOR PATENT INFRINGEMENT



(https://forbusiness.snapchat.com/audiences/ )

*9(d) when the information relevant to the detected triggering event comprises content information, inserting into the content information a meta tag for one or more advertisements to be displayed with the content information, and transmitting the content information that includes the meta tag to a mobile device,*

(https://blog.bufferapp.com/snapchat-ad-manager#what-are-snap-ads)

*9(e) wherein the meta tag identifies the one or more advertisements and advertisement display requirements, and wherein the one or more advertisements are selected based on the detected triggering event.*



(https://forbusiness.snapchat.com/audiences)

211. The '929 Accused System thus infringes at least one claim of the '929 Patent.

212. Upon information and belief, Defendant knew of the '929 Patent, or should have known of the '929 Patent but was willfully blind to its existence. Upon information and belief, Defendant has had actual knowledge of the '929 Patent, and its infringement thereof, since at least as early as the filing and/or service of this Complaint.

213. Additional allegations regarding Defendants' knowledge of the '929 Patent and willful infringement will likely have further evidentiary support after a reasonable opportunity for discovery.

214. Defendant's infringement of the '929 Patent was and continues to be willful and deliberate, entitling BlackBerry to enhanced damages and attorneys' fees.

215. Defendant's infringement of the '929 Patent is exceptional and entitles BlackBerry to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

216. BlackBerry has been damaged by Defendant's infringement of the '929 Patent and will continue to be damaged unless Defendant is enjoined by this Court. BlackBerry has suffered and continues to suffer irreparable injury for which there is no adequate remedy at law. The balance of hardships favors BlackBerry, and public interest is not disserved by an injunction.

217. BlackBerry is entitled to recover from Defendant all damages that BlackBerry has sustained as a result of Defendant's infringement of the '929 Patent, including without limitation lost profits and not less than a reasonable royalty.

## **PRAYER FOR RELIEF**

WHEREFORE, BlackBerry respectfully requests:

A.    That Judgment be entered that Defendant has infringed one or more claims of the Patents-in-Suit, directly and indirectly, literally and/or under the doctrine of equivalents;

B.    That, in accordance with 35 U.S.C. § 283, Snap, and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in active concert or participation with any of them, be preliminarily and permanently enjoined from (1) infringing the Patents-in-Suit and (2) making, using, selling, and offering for sale the Snapchat application and/or backend servers enabling the accused functionality of such application;

C.    An order directing Defendant to file with the Court and serve upon BlackBerry's counsel within thirty (30) days after entry of the order of injunction, a report setting forth the manner and form in which Defendant has complied with the injunction, including the provision relating to destruction and recall of infringing products and materials

D.    An award of damages sufficient to compensate BlackBerry for Defendants' infringement under 35 U.S.C. § 284, including an enhancement of damages on account of Defendants' willful infringement;

E.    That the case be found exceptional under 35 U.S.C. § 285 and that BlackBerry be awarded its reasonable attorneys' fees;

F.    Costs and expenses in this action;

G.    An award of prejudgment and post-judgment interest; and

H.    Such other and further relief as the Court may deem just and proper.

DATED:  April 3, 2018

QUINN EMANUEL URQUHART  &
SULLIVAN, LLP


By/s/ *James R. Asperger*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Victoria F. Maroulis (Bar No. 202603)
victoriamaroulis@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

BLACKBERRY CORPORATION
Edward R. McGah, Jr (SBN 97719)
Vice President, Deputy General Counsel
41 Ticknor Place
Laguna Niguel, California 92677
Telephone: (+1) 650-581-4750
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Attorneys for BlackBerry Limited

Case No. 2:18-cv-02693
COMPLAINT FOR PATENT INFRINGEMENT

# **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, BlackBerry respectfully demands a trial by jury on all issues triable by jury.

DATED:  April 3, 2018                    QUINN EMANUEL URQUHART  &
                                         SULLIVAN, LLP


                                         By /s/ *James R. Asperger*
                                         QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
                                           James R. Asperger (Bar No. 83188)
                                           jamesasperger@quinnemanuel.com
                                           865 S. Figueroa St., 10th Floor
                                           Los Angeles, CA 90017
                                           Telephone: (213) 443-3000
                                           Facsimile: (213) 443-3100

                                           Kevin P.B. Johnson (Bar No. 177129)
                                           kevinjohnson@quinnemanuel.com
                                           Victoria F. Maroulis (Bar No. 202603)
                                           victoriamaroulis@quinnemanuel.com
                                           555 Twin Dolphin Drive, 5th Floor
                                           Redwood Shores, CA 94065
                                           Telephone: (650) 801-5000
                                           Facsimile: (650) 801-5100

                                         BLACKBERRY CORPORATION
                                           Edward R. McGah, Jr (SBN 97719)
                                           Vice President, Deputy General Counsel
                                           41 Ticknor Place
                                           Laguna Niguel, California 92677
                                           Telephone: (+1) 650-581-4750
                                         James R. Asperger (Bar No. 83188)
                                         jamesasperger@quinnemanuel.com
                                         865 S. Figueroa St., 10th Floor
                                         Los Angeles, CA 90017
                                         Telephone: (213) 443-3000
                                         Facsimile: (213) 443-3100

                                         Attorneys for BlackBerry Limited