PAUL HASTINGS LLP
Yar R. Chaikovsky (SB# 175421)
yarchaikovsky@paulhastings.com
Philip Ou (SB# 259896)
philipou@paulhastings.com
David Okano (SB# 278485)
davidokano@paulhastings.com
Anthony Tartaglio (SB# 280286)
anthonytartaglio@paulhastings.com
1117 California Ave.
Palo Alto, CA 94304
Phone:  (650) 320-1800
Fax:  (650) 320-1900

Thomas O'Brien (SB# 166369)
thomasobrien@paulhastings.com
515 S. Flower St., Floor 25
Los Angeles, CA 90071-2228
Phone: (213) 683-6000
Fax: (213) 996-3146

Chad J. Peterman (*pro hac vice* application pending)
chadpeterman@paulhastings.com
200 Park Avenue
New York, NY  10166
Phone:  (212) 318-6000
Fax:  (212) 319-4090

Attorneys for Snap Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation,<br><br>                Plaintiff,<br><br>        vs.<br><br>SNAP INC., a Delaware corporation,<br><br>                Defendant. | CASE NO. 2:18-cv-02693-GW(KSx)<br><br>**SNAP INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)**<br><br>**HEARING DATE: August 2, 2018**<br>**TIME:  8:30 am**<br>**JUDGE: Hon. George Wu** |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................ 1

II.  LEGAL STANDARDS ................................................................ 1

III. THE TIME STAMP PATENT FAILS 35 U.S.C § 101 ................................. 3

    A.   Step One: The Time Stamp Patent is Directed to the Abstract Idea of Time Stamping ................................................................ 4

    B.   Step Two: The Time Stamp Patent Claims No Inventive Concept ...... 5

    C.   All the Claims of the Time Stamp Patent Fail 35 U.S.C § 101 ........... 7

IV.  THE "ACTION SPOT" PATENTS FAIL 35 U.S.C § 101 ........................... 8

    A.   Step One: The Action Spot Patent Claims are Directed to the Abstract Concept of Locating and Mapping Activity ........................... 9

    B.   Step Two: The Action Spot Patents Claim No Inventive Concept ...... 11

        1.   The Claimed Hardware is Generic ............................................. 11

        2.   The Claimed Steps Use Conventional Technology ................... 12

    C.   The Claims, as a Whole, are Unpatentable ........................................... 14

    D.   All the Claims of the Action Spot Patents Fail 35 U.S.C § 101 ......... 15

V.   THE SENDER COUNT PATENT FAILS 35 U.S.C. § 101 ...................... 16

    A.   Step One: The Sender Count Patent is Directed to the Abstract Idea of Displaying Information Regarding Unread Messages ........... 16

    B.   Step Two: The Sender Count Patent Claims No Inventive Concept ................................................................ 17

    C.   All the Claims of the Sender Count Patent Fail 35 U.S.C § 101 ......... 19

VI.  THE ADVERTISING PATENTS FAIL 35 U.S.C § 101 ........................... 19

    A.   Step One: The Advertising Patents are Directed to the Abstract Idea of Sending Advertisements to Users Based on Triggering Events ................................................................ 19

    B.   Step Two: The Advertising Patents Claim No Inventive Concept ...... 21

    C.   All the Claims of the Advertising Patents Fail 35 U.S.C § 101 ......... 22

VII. NO DISPUTED MATERIAL FACTS PREVENT DISMISSAL ................ 23

# TABLE OF CONTENTS
*(continued)*

**Page(s)**

VIII.   THE COMPLAINT INADEQUATELY PLEADS WILLFULNESS
        AND PRE-SUIT INDIRECT INFRINGEMENT ........................................... 24

IX.     CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) .................................................................. 3, 23

*Affinity Labs of Texas, LLC v. Amazon.com Inc.*,
  838 F.3d 1266 (Fed. Cir. 2016) .................................................................. 2, 20

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014).............................................................................. *passim*

*BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) .......................................................................... 6

*Berkheimer v. HP Inc.*,
  2018 U.S. App. LEXIS 14388 (Fed. Cir. May 31, 2018) .................................. 24

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018) ............................................................. 3, 5, 23

*Commer. Copy Innovations, Inc. v. Ricoh Elecs., Inc.*,
  17-CV-437-JVS, 2017 U.S. Dist. LEXIS 219052
  (C.D. Cal. Oct. 16, 2017).................................................................................. 25

*Core Wireless Licensing S.A.R.L. v. LG Elecs. Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018) ...................................................................... 6-7

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011) ........................................................ 5, 10, 17, 20

*Digitech Image Tech's. LLC v. Electronics for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) .......................................................................... 5

*Document Security Sys., Inc. v. Seoul Semiconductor Co.*,
  17-CV-981-JVS (C.D. Cal. Feb. 5, 2018) ........................................................ 25

*Eclipse IP LLC v. McKinley Equip. Corp.*,
  14-CV-742-GW, 2014 U.S. Dist. LEXIS 125395
  (C.D. Cal. Sept. 4, 2014) .................................................................................... 3

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Elec. Power Group, LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ...................................................................*passim*

*Emazing Lights LLC v. De Oca*,
No. SACV 15-1561-AG(Ex), 2016 WL 7507765
(C.D. Cal. June 20, 2016) ..................................................................... 24

*FairWarning IP, LLC v. Iatric Sys.*,
839 F.3d 1089 (Fed. Cir. 2016) ............................................................... 2

*Finjan, Inc. v. Cisco Sys.*,
No. 17-cv-00072-BLF, 2017 U.S. Dist. LEXIS 87657
(N.D. Cal. June 7, 2017)......................................................................... 24

*Global-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ............................................................................. 25

*Halo Elecs., Inc. v. Pulse Elecs.*,
136 S. Ct. 1923 (2016).......................................................................... 24

*Intellectual Ventures I LLC v. Capital One Bank*,
792 F.3d 1363 (Fed. Cir. 2015) ........................................................ 17, 20

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
850 F.3d 1332 (Fed. Cir. 2017) ........................................................ 15, 22

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017) ............................................................. 22

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ............................................................... 4

*International Designs Corporation, LLC v. Hair Art International, Inc.*,
Case No. 17-CV-8411 (C.D. Cal. Apr. 19, 2018) ................................. 23

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ............................................................. 18

*Morsa v. Facebook*,
77 F. Supp. 3d 1007 (C.D. Cal. 2014) *aff'd* Fed. Cir. Rule 36 ........................ 20

**TABLE OF AUTHORITIES**
(*continued*)

**Page(s)**

*Nanosys, Inc. v. QD Vision, Inc.*,
   No. 16-CV-01957-YGR, 2016 U.S. Dist. LEXIS 126745
   (N.D. Cal. Sep. 16, 2016) ....................................................................25

*Network Architecture Innovations LLC v. CC Network Inc.*,
   2:16-CV-00914-JRG, 2017 U.S. Dist. LEXIS 59310
   (E.D. Tex. Apr. 18, 2017) ....................................................................19

*Prod. Ass'n Techs. LLC v. Clique Media Group*,
   17-CV-05463-GW, 2017 U.S. Dist. LEXIS 217133
   (C.D. Cal. Oct. 13, 2017)..............................................................3, 22

*Quantum Stream, Inc. v. Charter Communs., Inc.*,
   17-CV-1696, 2018 U.S. Dist. LEXIS 33895
   (S.D.N.Y. Mar. 1, 2018) .............................................................19, 22

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
   855 F.3d 1322 (Fed. Cir. 2017) ....................................................1, 17

*SAP Am., Inc. v. InvestPic, LLC*,
   2018 U.S. App. LEXIS 12590 (Fed. Cir. May 15, 2018) ...............2, 23

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
   873 F.3d 905 (Fed. Cir. 2017) .............................................................14

*Soteria Encryption, LLC v. Lenovo US, Inc.*,
   16-CV-7958, 2017 U.S. Dist. LEXIS 193922 (C.D. Cal. Feb. 27,
   2017) ....................................................................................................25

*Telebrands Corp. v. GMC Ware, Inc.*,
   No. CV 15-03121 SJO, 2016 U.S. Dist. LEXIS 178545
   (C.D. Cal. Apr. 5, 2016) ......................................................................24

*In re TLI Comms. LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016) ....................................................*passim*

*Two-Way Media Ltd. v. Comcast Cable Commc'ns., LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) ......................................................2, 10

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Ultramercial, Inc. v. Hulu, LLC,*
  772 F.3d 709 (Fed. Cir. 2014) ....................................................... 2, 19

*Versata Dev. Group v. SAP Am., Inc.,*
  793 F.3d 1306 (Fed. Cir. 2015) ........................................................... 7

*Windy City Innovations, LLC v. Microsoft Corp.,*
  193 F. Supp. 3d 1109 (N.D. Cal. 2016) ............................................ 25

*Wongab Corp. v. Nordstrom, Inc.,*
  17-CV-2974-AB (C.D. Cal. Sept. 21, 2017) ..................................... 25

**Statutes**

35 U.S.C.
  § 101 ........................................................................................... *passim*

**Other References**

Rule 12(b)(6) ............................................................................................ 3

United States Geological Survey, *USGS Response to an Urban
  Earthquake: Northridge '94* (1996), available at
  https://pubs.usgs.gov/of/1996/ofr-96-0263/mainshk.htm ...................... 9

MPA IN SUPPORT OF SNAP'S MOTION TO DISMISS

I.    **INTRODUCTION**

Blackberry's patents are directed to the abstract ideas of time stamping, locating and mapping activity, counting the number of people who have sent you unread correspondence, and time/location-based advertising.  Each of these abstract ideas has been performed by humans in common practice long before Blackberry filed its patent applications.  Blackberry simply claimed computerized versions of these ideas using conventional technology.  Indeed, the specifications of Blackberry's patents repeatedly emphasize how the purported inventions can be practiced in *any* technical environment.  Where, as here, the claims of the patents-in-suit do not solve a specific technical need and "add nothing of substance to the underlying abstract idea," the claims are invalid and appropriately dismissed.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2360 (2014).

II.   **LEGAL STANDARDS**

*Alice* sets forth the well-known, two-step analysis for determining patent eligibility under 35 U.S.C. § 101.  *Id*. at 2355.

**Step one**: determine if the claims are "directed to" an abstract idea.  *Id.*  This inquiry centers on "whether the claims are directed to a 'specific means or method' for improving technology or whether they are directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co., Ltd*., 855 F.3d 1322, 1326 (Fed. Cir. 2017) (internal citations omitted).  Claims reciting "generalized steps to be performed on a computer using conventional computer activity" are abstract.  *In re TLI Comms. LLC Patent Litig*., 823 F.3d 607, 612 (Fed. Cir. 2016) (internal citations omitted).

**Step two**: If a claim recites an abstract idea, determine whether an "inventive concept" sufficient to "transform the nature of the claim into a patent-eligible application" exists.  *Alice*, 134 S. Ct. at 2355 (internal quotations omitted).  This ensures that the patent amounts to "significantly more" than the abstract idea.  *See id.* at 2355.  Using computers to perform "well-understood, routine, conventional activities previously known to the industry" such as to "obtain data" does not

1  qualify as an "inventive concept." *Id.* at 2359 (internal quotations omitted).  Claims

2  that recite "insignificant 'data gathering steps'" or "insignificant pre-solution

3  activity" are insufficient to supply an "inventive concept."  *See Ultramercial, Inc. v.*

4  *Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (internal citations omitted).

5  Likewise, claims for collecting, analyzing, and displaying data are abstract

6  absent "any particular assertedly inventive technology for performing those

7  functions." *Elec. Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1354-55 (Fed.

8  Cir. 2016).  The representative claim at issue in *Electric Power* was lengthy (made

9  up of eight paragraphs and covering an entire column in the patent) and very

10  detailed. *Id.* at 1351-52.  The claim described (a) the receipt of multiple data

11  streams concerning measurements on a power grid, power systems, and non-power

12  grid data, (b) detailed analysis of all the data, and (c) displaying the analysis and

13  metrics associated with all the data. *Id.* at 1351.  The Federal Circuit found that the

14  claim failed step 1 of *Alice* because collecting/analyzing information and displaying

15  certain results of that collection/analysis was an abstract concept, regardless of how

16  complicated the information was. *Id.* at 1353.  And it failed step 2 of *Alice* because

17  it called for only performing the abstract concept "on a set of generic computer

18  components and display devices." *Id.* at 1355 (citation omitted).  The Federal

19  Circuit has continued to apply the reasoning of *Electric Power* to invalidate patents

20  under § 101.[1]

21  Courts, including the present Court, routinely decide patent ineligibility under

22  

23  [1] *See SAP Am., Inc. v. InvestPic, LLC,* No. 2017-2081, 2018 U.S. App. LEXIS

24  12590 (Fed. Cir. May 15, 2018) (analyzing and graphing investment data); *Two-Way Media Ltd v. Comcast Cable Comms., LLC*, 874 F.3d 1329 (Fed. Cir. 2017)

25  (monitoring and analyzing data packets in a network); *FairWarning IP, LLC v.*

26  *Iatric Sys.*, 839 F.3d 1089 (Fed. Cir. 2016) (monitoring health information and notifying user when suspicious activity is detected); *Affinity Labs of Tex. v.*

27  *DIRECTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016) (selecting and watching a regional

28  broadcasting channel while outside the region, including a graphical user interface).

1   35 U.S.C. § 101 at the Rule 12(b)(6) stage.[2]  As will be discussed below, the

2   recently-decided *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d

3   1121 (Fed. Cir. 2018) and *Berkheimer v. HP Inc*., 881 F.3d 1360 (Fed. Cir. 2018)

4   cases affirm the propriety of invalidating claims based on § 101 at the Rule 12(b)(6)

5   stage where, as here, there are no genuine disputes over underlying material facts.

6   **III.    THE TIME STAMP PATENT FAILS 35 U.S.C. § 101**

7        U.S. patent 8,301,713 ("'713 patent" or "the Time Stamp Patent") claims

8   displaying time stamps within an electronic conversation if a "predetermined

9   duration of time" passes between communications.  Claim 1 is representative.  Fig.

10  5[3] shows an electronic conversation with time stamps 84, 92 as recited by the claim.



18  Blackberry concedes that email and instant messenger programs having time stamps

19  were well-known at the time.  *See* Complaint at ¶ 127 ("At the time of the '713

20  Patent, timestamps were typically displayed for every message in a conversation or

21  not at all.").  Thus, the only possible "invention" of the Time Stamp Patent is

22  applying time stamps *selectively* based on the passage of a predetermined duration

23  of time.  For example, if a predetermined duration of time has elapsed after the first

24

25  _____

26  [2] *See Prod. Ass'n Techs. LLC v. Clique Media Group*, 17-CV-05463-GW, 2017 U.S.
    Dist. LEXIS 217133 (C.D. Cal. Oct. 12, 2017); *Eclipse IP LLC v. McKinley Equip.*

27  *Corp.*, 14-CV-154-GW, 2014 U.S. Dist. LEXIS 125395 (C.D. Cal. Sept. 4, 2014).

28  [3] The blown-up portion of the figure has been modified and annotated for clarity.

communication, the second communication will bear a time stamp.

## A.    **Step One: The Time Stamp Patent is Directed to the Abstract Idea of Time Stamping**

The Time Stamp Patent is directed to the abstract idea of time stamping, an utterly unremarkable idea that has been practiced manually for centuries.  Examples of time stamping include people recording the date and time in letters they write and in diary/journal entries; factory workers and others clocking in and out of their jobs using timecards; post offices stamping the date and time in postmarks on letters; and courts or other agencies stamping the date and time on documents that are received.  In the electronic age, answering machines, fax machines, emails, and instant messages time stamp communications.

The concept of time stamping communications after a predetermined duration of time was also well-known.  For example, when a company sends a bill in the mail with a due date and the recipient pays late (*i.e.*, after the predetermined time), the company (either physically or mentally) time stamps the return communication as late and may impose some additional fees.

The patent claims are directed towards applying a time stamp, based on whether a certain amount of time has passed.  But this is nothing more than applying a simple rule to incoming correspondence, which the Federal Circuit has found to be an abstract idea.  In *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016), a claim was invalid when it called for selectively applying business rules to incoming e-mail messages and then processing those messages based on the outcome of the rule determinations.  Similarly, in this case, the claimed system identifies an electronic message, applies a business rule (checking whether a predetermined amount of time has passed without an additional message), and then takes an action based on the application of that rule (applying a time stamp).  And, as in *Symantec*, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a

1   human, mentally or with pen and paper." *Id*. at 1318.  The decision of whether to

2   apply a time stamp, as described in the claim, requires nothing more than checking

3   to see if enough time has passed before displaying the time.  The fact that this

4   decision-making process can be performed manually confirms its abstract

5   nature.  *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed.

6   Cir. 2011) (steps performable by the human mind do not add patentable weight).

7        While the specification of the Time Stamp Patent describes the purported

8   invention as being useful for saving space on devices with small screens, the claims

9   are not so limited.  *See* '713 patent, 3:2-8, 2:24-27.   First, the claims are not limited

10   to handheld devices.  They recite implementation on completely generic electronic

11   devices with displays, memory, processors, and/or computer readable media.  *Id.*,

12   claims 1-12.  And, in any event, "[l]imiting the invention to a technological

13   environment does not make an abstract concept any less abstract under step one."

14   *Berkheimer*, 881 F.3d at 1367 (quotation omitted).  Second, the claims of the patent

15   are so broad that they purport to cover time stamping after the expiration of any

16   "predetermined duration of time," which the specification states "could be set at ***any***

17   duration" of time.  '713 patent, 5:51-57 (emphasis added).  The patent does not

18   identify any particular duration of time as advantageous for practicing the invention.

19   A claim that is "so abstract and sweeping as to cover any and all uses" of a time

20   stamp for an electronic message cannot survive § 101.  *Cf. Digitech Image Techs.*

21   *LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014) (citation

22   omitted).  Given their breadth, the claims amount to nothing more than using

23   conventional computer activity to carry out a pre-existing abstract idea.  *Alice*, 134

24   S. Ct. at 2359.

25        **B.    Step Two: The Time Stamp Patent Claims No Inventive Concept**

26        The claims of the Time Stamp Patent offer no "inventive concept" to make

27   them patent eligible.  *See Alice*, 134 S. Ct. at 2355.  This is not a case where a patent

28   claims a "non-conventional and non-generic arrangement of known, conventional

pieces." *Cf. BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350-52 (Fed. Cir. 2016) (claims described placing a filter at a particular location and giving users the ability to customize filtering for their individual network accounts).   Rather, the claimed technology is wholly conventional and well-known.  Consider claim 9, which is a claim for an apparatus.  The apparatus consists of "an electronic device," "a display," "a memory," and a "processor." These are generic, well-known elements of virtually any computer.  In fact, the specification acknowledges that "[n]umerous types of handheld electronic devices are known," so there is nothing unconventional about the claimed hardware.  '713 patent, 1:24.  The communications systems used are conventional and may have a wired or wireless connection. *Id*., 4:37-55.  The user could control the mobile device with a cursor or "virtually any other type of input desired." *Id.*, 7:27-31. And it was already well-known that these devices were capable of operating instant messaging programs. *Id.*, 1:29-46. ("Electronic devices, including handheld electronic devices, are capable of numerous types of communication. One type of communication is 'messaging,' and one type of messaging is 'instant messaging.'").

The patent does not disclose any specific software algorithms, either.  Instead, it describes the purported invention in a vague and open-ended way. For example, the system could use *any* predetermined amount of time in deciding whether to apply a time stamp. *Id.*, 5:51-57.

There is also nothing unconventional about the display of the time stamps. The patent acknowledges that displaying the time stamp could be done in any way. "[T]he time stamps could be provided in *any format* without departing from the concept of the invention." *Id.*, 7:34-37; 6:58-60 ("Other positioning of the…[time stamps] are possible within the concept of the invention.").  The particular format of the time stamp is also immaterial: "other [time stamp] configurations will be apparent and will be within the concept of the invention." *Id.*, 7:40-50.

Snap expects that Blackberry will attempt to rely on *Core Wireless Licensing*

1    *S.A.R.L. v. LG Elecs. Inc.*, 880 F.3d 1356 (Fed. Cir. 2018) in opposing this motion.

2    The claims of the Time Stamp Patent are demonstrably different than the claims

3    found patent eligible in *Core Wireless* because those claims were directed to an

4    improved user interface that *claimed* both (1) a detailed menu structure and

5    functionality and (2) the ability to view certain data before an application was

6    launched.  Those claim "limitations disclose[d] a specific manner of displaying a

7    limited set of information to the user, rather than using conventional user interface

8    methods to display a generic index on a computer." *Id.* at 1363.  This stands in stark

9    contrast to the Time Stamp Patent, which does not claim a specific manner of

10   displaying a time stamp.  The claim does not limit the format of the time stamp, just

11   the time that it can be displayed (after a predetermined duration of time).

12        Blackberry may argue that, even if the particular elements of a claim were

13   well-known and conventional, the ordered combination of the elements makes the

14   claim eligible for patenting.  An ordered combination is unpatentable where the

15   elements "add nothing that is not already present when the steps are considered

16   separately," for example, where "claims simply recite the [abstract idea] as

17   performed by a generic computer." *Alice*, 134 S. Ct. at 2359 (citation omitted); *see

18   also Versata Dev. Group v. SAP Am., Inc.*, 793 F.3d 1306, 1334 (Fed. Cir. 2015); *In

19   re TLI Comm.*, 823 F.3d at 615.

20        Even when considered as an "ordered combination," *Alice*, 134 S. Ct. at 2355,

21   the elements of the claims do not satisfy § 101.  The patent fundamentally just

22   recites putting a time stamp on a message after some period of time has elapsed.

23   The hardware elements are generic and conventional.  And there is no specific

24   software algorithm claimed—the claims merely describe the desired result.  The

25   sum of the elements adds nothing not already present when the steps are considered

26   separately.

27   **C.     All the Claims of the Time Stamp Patent Fail 35 U.S.C. § 101**

28        All claims of the Time Stamp Patent are invalid, for similar reasons.  Each of

1 the independent claims is either a method or apparatus using the generic computing

2 components and activity described above.  The dependent claims are directed to

3 basic communication concepts and the location of the time stamp, which are all

4 conventional.  *See, e.g.,*'713 patent, 1:37-56; 7:8-9; 7:34-37; *see also* Exhibit A.

5 **IV.    THE "ACTION SPOT" PATENTS FAIL 35 U.S.C. § 101**

6         U.S. patents 8,326,327 ("the '327 patent") and 8,825,084 ("the '084 patent")

7 (collectively, "the Action Spot Patents") [4] are directed to determining and displaying

8 the location of "an action spot" on a map. Claim 1, which is illustrated by Fig. 3 of

9 the '327 patent, is representative of the purported invention.

10 **1**. A mobile device comprising:
a display; and

11 a processor module communicatively coupled to the display and configured to receive executable instructions

12 to:
display a graphical user interface on the display;

13 receive data indicative of a current location of the mobile device;

14 determine at least one action spot within a predetermined distance from the current location of the

15 mobile device, the at least one action spot corresponding to a location where at least one other mobile

16 device has engaged in documenting action within a predetermined period of time;

17 signify the at least one action spot on the graphical user interface; and

18 provide an indication of activity level at the at least one action spot.



19

20 An "action spot" is defined broadly as "a location or an event where at least one

21 activity is occurring relative to the current location of another mobile device." '327

22 patent, 1:6-10, 2:63-65.  The action spot is within a predetermined distance from a

23 first mobile device and corresponds to a location where other mobile devices are

24 performing "documenting activities," including the taking of photos/videos or

25 messaging. *Id.*, 2:54-63.  The patent calls for displaying the action spot on a screen

26 ─────────────────

27 [4] The '084 patent is a continuation of the '327 patent and they have substantively

28 identical written specifications and figures, and similar claims.

and indicating an "activity level" of the action spot.  In Fig. 3, action spots 304 and 306 are shown on a map in relation to the first mobile device's position 302.  "[T]he action spots 304, 306 can have different sizes to indicate the level of activity associated with the action spot." *Id.*, 6:23-25.

### A.   Step One: The Action Spot Patent Claims are Directed to the Abstract Concept of Locating and Mapping Activity

The claims of the Action Spot Patents are directed to the conventional and abstract concept of locating and mapping activity, and fail step one of *Alice.* 134 S. Ct. at 2355.  The specifications of the Action Spot Patents admit that locating and mapping activity was done manually in the prior art through the use of maps, event calendars, and other sources of information as part of a "process of manually researching events and happenings, determining the location of the events and happenings, and comparing the location of the events and happenings to the user's current location." '327 patent, 2:66-3:20.  Before the days of cellphones, people routinely mapped their evenings out manually based on their locations and parties or other events they knew about.

Other examples of mapping activity within a predetermined distance from a first location abound.  For example, following the Northridge earthquake, seismologists mapped aftershocks (action spots) within a predetermined distance of Northridge and provided an indication of their magnitude (activity level) by the size of the circles on the map.[5]  Similarly, police departments have long tracked crime patterns using maps indicating location and activity levels, and traffic reporters generate traffic maps showing accidents and traffic activity relative to a location, for example Los Angeles International airport.

---

[5] United States Geological Survey, USGS Response to an Urban Earthquake: Northridge '94 (1996), available at https://pubs.usgs.gov/of/1996/ofr-96-0263/mainshk.htm.

At its core, claim 1 of the '327 patent is directed to a display, a processor, and software programmed to implement the generalized steps of: (1) *data collection* (*i.e.*, receiving data indicating the location of a mobile device), (2) *data analysis* (*i.e.*, determining the location and activity level of an action spot where at least one other mobile device has engaged in a documenting action within a certain distance and timeframe), and (3) *display* (*i.e.*, displaying a graphical user interface ("GUI") and signifying the action spot on the GUI with an indication of the activity level of the action spot) in a generic mobile environment.  Each claim in the Action Spot Patents follows this general structure.  Thus, the claims in the Action Spot Patents are analogous to those in *Electric Power* which, as discussed above, collected, analyzed, and displayed voluminous and complicated information using generic computer technology.  830 F.3d at 1353-54.  Patents for computer technology must claim ***improvements*** in computer technology to be patent eligible, not particular uses of conventional computer technology.  *See id*.

Collecting information, even when limited to a particular location and documenting activity, is an abstract idea.  *Electric Power* explained that even when the type of information at issue is specific, that "does not change its character as information."  *Id*.  Analyzing information, particularly using processes that could be done manually, is abstract.  *CyberSource,* 654 F.3d at 1372; *Elec. Power*, 830 F.3d at 1354.  And displaying information, including location and activity level, is abstract.  *Elec. Power*, 830 F.3d at 1354.

The abstract nature of the claims of the Action Spot Patents is further illustrated by the fact that none of the claims provides detail on how to implement the invention.  Rather, the claims rely on broad, functional language, including "receiving," "determining," "displaying," and "signifying."  The Federal Circuit has repeatedly identified similar "result-based functional language" as "abstract."  *See, e.g.*, *Two-Way Media*, 874 F.3d at 1337 ("sending" and "directing" of information "d[id] not sufficiently describe how to achieve these results in a non-abstract way").

The claims of the Action Spot Patents recite generic devices (*i.e.*, mobile device, processor module, display, servers) and provide generalized steps using conventional computer activity, all of which confirms their abstract nature. *In re TLI Comms.*, 823 F.3d at 613; '327 patent, claims 1-20; '084 patent, claims 1-17.

## B.  Step Two: The Action Spot Patents Claim No Inventive Concept

The second part of *Alice* requires the Court to consider whether any elements of the claims "transform the nature of the claim into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (citation omitted). The claims fail to do this. When viewed as a whole, the claims merely describe a method to monitor any action taken by any mobile device, occurring at any location, using any computer network, using any method for computing an "activity level," and using existing and conventional technology. The claims do not purport to improve existing technology. Rather, as discussed below, (1) the claimed hardware is generic and (2) each claimed step uses conventional technology.

### 1.  The Claimed Hardware is Generic

The specification directly acknowledges that by the earliest priority date of the Action Spot Patents (August 2010), mobile devices were ubiquitous and capable of performing a wide variety of functions (including documenting, mapping, and navigating):

> Mobile devices allow users to have an integrated device which can perform a variety of different tasks. For example, a mobile device can be enabled for each of or some of the following functions: voice transmission (cell phones), text transmission (pagers and PDAs), sending and receiving data for viewing of Internet websites, multi-media messages, videography and photography. ***Additionally, mobile devices can include one or more applications such as a map application or a navigation application for retrieving maps and directions to locations relative to the mobile device.***

'327 patent, 1:23-33 (emphasis added). The specification makes no claim that Blackberry added unconventional hardware, or overcame some technical limitation

in mobile devices.  Claim 1 of the '327 patent, for example, claims "a mobile device," a "display," and "a processor module" configured to execute certain instructions, which are all generic.  *See* '327 patent, 2:32-35 (defining "mobile device" as "***any*** electronic device" capable of accepting information entries and having a power source); 3:37-44 (claims can be implemented on "***any*** mobile device"); 4:64-5:4 ("The display screen 102 can be . . . ***any*** display screen . . ."); 17:7-14 (technology could be implemented in firmware, software, microcode, an FPGA, or an ASIC); 17:15-28 (disclosure may be practiced "with many types of computer system configurations").  In sum, the purported invention works with conventional and well-known mobile technology.  "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2358.

### 2.    The Claimed Steps Use Conventional Technology

The claimed steps also use techniques the specification admits were conventional, further underscoring the lack of inventive concept.  *Cf. Alice*, 134 S. Ct. at 2358 (claim was invalid where "the computer implementation was purely conventional").

*Locating the Mobile Device*

The Action Spot Patents themselves state that geo-location was a conventional task with many existing tools able to implement it.  *See* '327 patent, 3:56-63 ("a satellite positioning system, a communications network system, a triangularization system, or any other system that allows for determining the location or position of a device" can implement geo-location).  The claims recite determining location in a wholly generic way.  For example, claim 1 of the '327 patent just recites receiving location data, and claim 13 of the '327 patent calls for "determining, via a processor, a current location of the mobile device."  No claim discloses any method for computing the current location of the mobile device.

*Determining Action Spot and Activity Level*

1      The steps of determining the action spot and its activity level are similarly

2  generic.  The claims say only that the action spot is "determined" and

3  "correspond[s]" to a location of nearby documenting actions, without any

4  explanation of how that determination occurs.  The discussion of the "activity level"

5  is even more generic.  The claims do not even separately spell out the calculation of

6  the activity level as a distinct step.  This sort of functional, results-orientated

7  language, devoid of specific instructions, "has been a frequent feature of claims held

8  ineligible under § 101." *Electric Power*, 830 F.3d at 1356.[6]

9      The specification does not disclose any specific method of monitoring nearby

10  documenting actions over a telecommunications network.  Rather, it purports to

11  cover any type of communication system.  '327 patent, 16:50-54 ("***any type of***

12  ***communication*** [where] both the wireless network 914 and mobile device 100 are

13  enabled to transmit, receive and process.") (emphasis added).  The specification lists

14  a series of well-known, conventional communications protocols, and adds that

15  "other networks" and "any virtual posting forum" can be used to determine action

16  spots. *Id.,* 15:55-66; 7:57-62.

17      The specification lists examples of documenting activities at an action spot,

18  but states that "any similar documenting action" can be the basis for an action spot.

19  *Id.,* 4:4-10.  The level of activity can be calculated by any method including

20  counting certain photos, videos, messages, "or any other number that is

21  representative of the level of activity occurring at the action spot . . . ." *Id.,* 12:33-

22  42.  For example, to indicate that a person nearby is capturing video, the system

23  could monitor "a social networking site, a video posting site, ***or any other virtual***

24  ***posting forum*** . . . ." *Id.*, 9:40-43 (emphasis added).  And the corresponding level of

25  _____

26  [6] Claims 3 and 15 of the '327 patent and claims 1 and 13 of the '084 patent claim
state that activity level is "based upon" at least one of the number of images

27  captured, videos captured, and or messages transmitted.  The claims do not provide
an algorithm for converting this information into an activity level, however.

28

1   activity can be determined by the size of data packets, the length of the video, "or
2   *any other calculation or method* of determining the level of video recording
3   activity." *Id.*, 9:51-57 (emphasis added).

4         The "predetermined distance" and "predetermined period of time" elements
5   do not make the claims any less abstract.  The "predetermined distance" could be
6   anything from ten yards to "any other distance from the current location of the
7   mobile device 100." *Id.*, 8:23-28.  And the "period of time" could be the last half-
8   hour "or any other time period . . . ." *Id.*, 8:35-39.  Because the distance and time
9   could literally be anything, they add nothing of substance to the claims.

10        Furthermore, the purported inventive concept of the patents—the
11   determination of an "action spot"—was already well-known.  As noted above, the
12   patent specification states that determining action spots could be done manually. *Id.*,
13   2:66-3:20.  The fact that a patent claim may "make a process" of finding an action
14   spot "more efficient, however, does not necessarily render an abstract idea less
15   abstract." *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910
16   (Fed. Cir. 2017).

17         *Displaying the Results*

18         The displaying steps are generic and do not recite any technical limitations on
19   how the display may occur.  The claims cover virtually any display on virtually any
20   computing device.  For example, the specification explains that the graphical user
21   interface could be *any* GUI capable of displaying action spots relative to the user.
22   '327 patent, 3:45-53; 4:64-5:4.  And the action spots can be represented by *any*
23   graphical item. *Id.*, 4:25-30; 6:16-22.

24   **C.   The Claims, as a Whole, are Unpatentable**

25         Even when analyzed as "an ordered combination," the claims of the Action
26   Spot Patents do not recite patent-eligible subject matter.  After all, the claims call for
27   simply mapping and displaying nearby activity using well-known, generic
28   technology.  They are nothing more than the expected sum of their conventional

parts.  The claims recite generic hardware elements that, when combined, add nothing that is not already present when the elements are considered separately. And the software "instructions" in the claim are described in purely functional terms that could be performed on any mobile computer.  *See Intellectual Ventures I, LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("*Capital One II*").

### D.   All the Claims of the Action Spot Patents Fail 35 U.S.C. § 101

While this Memorandum has primarily analyzed exemplary claim 1 of the '327 patent, the other claims of the Action Spots Patents fare no better under §101. *See* Exhibit A.  The essential nature of each claim is to collect, analyze, and display action spots, without any regard to hardware specifications or limitations.  The other independent claims of the '327 patent (*i.e.*, 10 and 13) parallel claim 1.  Claim 13 is the same as claim 1, just written in method form.  Claim 10 is the same as claim 13, but it calls for displaying a graphic to identify the direction to travel to the action spot, instead of displaying the action spot itself.  The other remaining dependent claims (*i.e.*, 2-9, 11-12, and 14-20) recite conventional and well-understood graphical, counting, navigational, and mapping techniques, such as coloring certain spots on the map or providing directions to the action spots.[7]  The claims of the '084 patent claim a generic server/software to implement the abstract method disclosed in the '327 patent.[8]

---

[7] *See* '327 patent, 1:23-32; 2:66-3:2; 3:4-16; 8:23-28; 10:17-30; Prosecution of '327 patent, Non-final Rejection at 5 (April 18, 2012) (discussing U.S. App. 2008/0163057, Fig. 2) (Exhibit B); Prosecution of '084 patent, Non-final Rejection at 2-3 (July 25, 2013) (discussing U.S. application 2010/0248746, ¶ 22) (Exhibit B).

[8] *See* '084 patent, 3:51-60; 6:25-31; 8:44-48; 10:26-37; 15:62-16:9.

## V.   THE SENDER COUNT PATENT FAILS 35 U.S.C. § 101

U.S. patent 8,209,634 ("Sender Count Patent" or "'634 patent") describes a system for notifying a user when they receive a message from a new correspondent.[9] The intrinsic record of the patent makes clear that the idea of using an icon to display the receipt of new messages was already well-known at the time.  *See, e.g.,* '634 patent, 1:43-52.  The purported invention is for updating an icon to show how many ***people*** have sent you an unread message, as opposed to how many total unread messages there are.  Fig. 7, for example, shows a Sender Count 400 indicating that there are unread messages from two new senders.



### A.   Step One: The Sender Count Patent is Directed to the Abstract Idea of Displaying Information Regarding Unread Messages

The claims of the Sender Count Patent are directed to an abstract idea of displaying information regarding unread messages.  *See* Exhibit A; Dkt. 1-4 at p. 18. The claims are abstract because they simply collect, analyze, and display information regarding the number of senders of unread correspondence.  *Elec. Power*, 830 F.3d at 1353.  For example, claim 1 of the Sender Count Patent is directed to a method for providing notifications on a wireless communication device with the generalized steps of: (1) *data collection* (*i.e.*, receiving a plurality of electronic messages from a plurality of senders), (2) *data analysis* (*i.e.*, determining how many different senders there are of unread messages), and (3) *display* (displaying and updating an icon with the count of senders of unread messages). Restricting the claims to electronic messaging does not make them less abstract.  *Id*.

The claims of the Sender Count Patent simply recite generic devices (*i.e.*,

---

[9] The Sender Count Patent and the Advertising Patents, discussed *infra*, are the subject Facebook's pending motion to dismiss filed in *Blackberry Ltd. v. Facebook, Inc. et al.*, 18-cv-01844-GW-KS (C.D. Cal.) (D.I. 31).  Facebook's motion, attached as Exhibit D, is set for a hearing at the same time as the instant motion.

wireless communication device, computer-readable memory, a processor, a display), generic software (*i.e.*, an electronic messaging program), and provide generalized steps using conventional computer activity, all of which further confirms their abstract nature. *In re TLI Comms.*, 823 F.3d at 612; '634 patent, claims 1-18. Further, as discussed more below, the patent does not claim or discuss any technical challenges that were overcome by the purported invention. The claims of the Sender Count Patent cover ***any*** method for counting senders. Because there is "not any particular assertedly inventive technology for performing" the functions of the claims, "[t]hey are therefore directed to an abstract idea." *Elec. Power*, 830 F.3d at 1354; *see also RecogniCorp*, 855 F.3d at 1326.

Finally, keeping track of how many senders have sent unread messages is something that can and has been done manually. Assistants routinely tell their bosses how many people called while they were out. The only difference is that the Sender Count Patent attempts to clothe the idea in generic computing elements such as a "wireless communication device" and a "display." But determining the number of senders is the most basic of calculations, and the fact that it can be done without any computer further demonstrates abstraction. *CyberSource Corp.*, 654 F.3d at 1371; *Intellectual Ventures I LLC v. Capital One Bank USA*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) ("*Capital One I*") (internal quotations omitted).

**B.**   **Step Two: The Sender Count Patent Claims No Inventive Concept**

Nothing in either the claims or the specification of the Sender Count Patent elevates the claimed idea into patentable subject matter. Although the claims refer to a "wireless communication device," the specification explains that this could be essentially any mobile computing device. '634 patent, 5:14-19. The CPU (3:61-4:2) and keyboard (4:2-8) are also described in generic terms. The patent even states that the purported invention "may be implemented in a number of fashions depending, in part, on operating system and other system services and the interface between communication subsystem 211 and microprocessor 238." *Id.*, 9:46-50.

The first two steps of claim 1, which is representative, describe displaying an icon relating to an electronic messaging program and receiving a plurality of messages from different senders.  But the "Description of the Related Art" portion of the specification explains that these steps were already well-known:

> **Notification icons are often rendered** on a portion of the main screen to **indicate a new event such as the receipt of a new IM message, electronic mail (e-mail)** or other service event such as a calendar reminder or alarm and other status information such as time, date and battery life. For each type of service or function available via the device, a graphical image or icon is **often rendered** on a major portion of the main screen, which icon may be selected using a cursor or other means to launch a specific GUI for the selected service or function.

*Id.*, 1:43-52 (emphasis added).

The third step of claim 1 describes modifying an icon to reflect the count of correspondents having sent unread mail.  This too is uninventive and conventional, as shown by the specification's admission that "persons of ordinary skill in the art will appreciate" that this is just one example of any sort of "other information" that could be displayed:

> Persons of ordinary skill in the art will appreciate that a visual modification 400 different from a bubble may be used and the count may represent other information, such as the number of correspondents or "buddies" from which one or more messages have been received but remain unread.

*Id.*, 8:8-13.  Because this was so conventional, the specification does not even explain how to go about programming this functionality.  *Cf. Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) ("The mechanism for maintaining the state is not described, although this is stated to be the essential innovation.").  And the specification concedes that the choice of icon is arbitrary: "For simplicity, each icon is represented as a circle but persons of ordinary skill in the art will appreciate that other graphics may be used." '634 patent, 7:52-54.

Considering the claims of the Sender Count Patent as "an ordered

combination" does not lead to a different result because the claims "simply recite the [abstract idea] as performed by a generic computer."  *Alice*, 134 S. Ct. at 2359.

## C.   All the Claims of the Sender Count Patent Fail 35 U.S.C. § 101

The other claims of the Sender Count Patent are invalid for similar reasons. The other independent claims (*i.e.*, 7 and 13) are system claims that parallel claim 1. The dependent claims (*i.e.*, 2-6, 8-12, 14-18) add well-known and conventional ways to view the icon or message.  *See, e.g.,* 1:43-52; 8:48-51; *see also* Exhibit A.

## VI.   THE ADVERTISING PATENTS FAIL 35 U.S.C. § 101

U.S. patents 8,296,351 ("the '351 patent") and 8,676,929 ("the '929 patent") (collectively, "the Advertising Patents")[10] relate to pushing (sending) information (including advertisements) to a user based on a "triggering event," such as the location of the user or time.  Claim 1 for each of the patents is representative.  *See* Exhibit A; Dkt. 1-5 at p. 19; Dkt. 1-6 at p. 19.

## A.   Step One: The Advertising Patents are Directed to the Abstract Idea of Sending Advertisements to Users Based on Triggering Events

The claims of the Advertising Patents are directed to the abstract idea of sending information (*e.g.*, advertisements) to users following a triggering event, such as location or time.  Courts have routinely found advertising-related patents abstract.[11]  Comparing the idea at issue in the Advertising Patents with the one

---

[10] The '929 patent is a continuation of the '351 patent; the patents have substantively identical written specifications and figures, and similar claims.

[11] *See Ultramercial*, 772 F.3d at 715 (invalidating claims directed to "the abstract idea of showing an advertisement before delivering free content"); *Quantum Stream, Inc. v. Charter Comms., Inc.*, 17-CV-1696, 2018 U.S. Dist. LEXIS 33895, at *38 (S.D.N.Y. Mar. 1, 2018) (finding claims for filling content "vacancy" with advertisement were unpatentable); *Network Architecture Innovations LLC v. CC Network Inc.*, 2:16-CV-00914-JRG, 2017 U.S. Dist. LEXIS 59310, at *11 (E.D. Tex. Apr. 18, 2017) ("The concept of pairing advertisements with content requested by the user over the Internet is not new, and is an idea that the Federal Circuit has

found to be abstract in *Capital One I* is particularly instructive.  792 F.3d at 1367-68.  The Federal Circuit summarized the *Capital One I* claim as "relat[ing] to customizing information based on (1) information known about the user and (2) navigation data." *Id*. at 1369.  This is quite similar to the Advertising Patents' claims: pushing advertisements based on location of the user (a location is "information known about the user") or time.

The Federal Circuit held that sending information to a user based on information known about the user or time was "fundamental" and "long prevalent in our system," as "newspaper[s] might advertise based on the customer's location" and "television commercials for decades tailored advertisements based on time of day during which the advertisement was viewed." *Id*. at 1369-1370; *see also Affinity Labs*, 838 F.3d at 1271 ("tailoring of content based on information about the user—such as where the user lives or what time of day the user views the content—is an abstract idea").  The same conclusion applies here because the Advertising Patents similarly try to patent the very idea of sending information provided to a consumer based on information about the consumer (*i.e.*, location) and time.  As discussed more fully below, the claims of the Advertising Patents simply recite generic devices to carry out the abstract idea, which does not make it patent-eligible. *In re TLI Comms.*, 823 F.3d at 612.

Further confirming the abstract nature of the claims is the fact that the steps of the claims can be performed manually.  *CyberSource*, 654 F.3d at 1372.  For example, the ubiquitous "junk mail" that clogs up postal mailboxes is a readily identifiable example of this abstract idea. Some junk mail is targeted to recipients based on triggering events, such as the recipient's location (address) (*e.g.*,

---

repeatedly found as abstract."); *Morsa v. Facebook*, 77 F. Supp. 3d 1007, 1014 (C.D. Cal. 2014) (invalidating claims directed to abstract ideas of "targeting advertisements to certain consumers, and using a bidding system to determine when and how advertisements will be displayed") (*aff'd* Fed. Cir. Rule 36).

neighborhood stores), time (*e.g.*, upcoming holiday or birthday), and other triggers (*e.g.*, purchases from similar stores, membership in certain groups).

### B.    Step Two: The Advertising Patents Claim No Inventive Concept

There are no specific elements in the claims of the Advertising Patents that transform the abstract idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. The claims are drafted without regard to any specific hardware or software and claim the use of only conventional components. These include mobile devices, servers and/or databases that include memory locations, wireless networks, and tags used to identify digital content. *See* '351 patent, claim 1; '929 patent, claim 9.

The specification of the Advertising Patents makes clear that no specialized hardware is required and that the claim is for ***any*** mobile computing device. '351 patent, 1:25-28 ("The invention is particularly well suited for use with Personal Digital Assistants (PDAs), cellular telephones, and other mobile handheld communication devices (collectively referred to herein as "mobile devices")."). The specification describes conventional servers, data sources, and wireless networks. *Id.* at 2:57-59, 4:14-15 (the "[p]roxy content server . . . may be implemented in several ways"); *id.* at 2:28-31 ("The Information Sources 10 may, for example, be a series of computers or databases on a local area network (LAN) available through a computer network, such as the Internet 16."); *id.* at 5:4-7 ("The wireless network 22 may be a traditional radio frequency (RF) network, such as a cellular network . . .").

The specification admits that transmitting information to mobile devices from a network was well-known. *Id.* at 1:32-35. Also, it admits that network services that "automatically 'push' small amounts [of] information" to paging devices were conventional. *Id.* at 1:39-43.

The use of "meta tag[s]" in connection with the '929 patent does not make the claims less abstract or introduce an inventive concept. Meta tags themselves are merely information that "identif[y] the . . . advertisements and advertisement display requirements." '929 patent, claim 1. And using "meta tags" does not make the

claims patentable because the '929 patent acknowledges that they were conventional and there already existed numerous "standard techniques" for inserting them. '929 patent, 12:5-11.   These "tags" describe generic data structures that assist in the collection, organization, and manipulation of information, and do not change the character of the underlying abstract concept.  The Federal Circuit has found that similar data structures used to label, store, and organize information in XML documents did not transform the underlying abstract concept into a patent-eligible application of that concept.  *See Capital One II*, 850 F.3d at 1339–41 ("broadly defined labels for generic data types" did not recite inventive concept).[12]   And limiting these tags to a particular environment does not make them any less well-known or conventional.  *See, e.g. Quantum Stream*, 2018 U.S. Dist. LEXIS 33895, at *38 (claims for "generic equipment performing the straightforward, conventional tasks of assembling custom advertising.").

Here, the addition of known computer technology performing in accordance with their well-understood, conventional operation does not add "significantly more" than the abstract idea itself.  *Alice*, 134 S. Ct. at 2355.  The mere computerization of the abstract idea of sending advertisements to users following a triggering event does not render the idea patent eligible.[13]

### C.      All the Claims of the Advertising Patents Fail 35 U.S.C. § 101

The remaining claims of the Advertising Patents are invalid for similar

---

[12] *See also Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1331 (Fed. Cir. 2017) (use of network pointers was unpatentable); *Quantum Stream*, 2018 U.S. Dist. LEXIS 33895, at *38 ("information relating to the . . . [advertising] content" (*e.g.*, meta tags) unpatentable); *Prod. Ass'n Techs. LLC.*, 2017 U.S. Dist. LEXIS 217133, at *22-23 (inserting hyperlinks into web page that correspond to "cross-referencing resource" unpatentable).

[13] Considering the claims of the Advertising Patents as "an ordered combination" does not lead to a different result because the claims "simply recite the [abstract idea] as performed by a generic computer." *Alice*, 134 S. Ct. at 2359.

reasons.  The other independent claim (Claim 14) of the '351 patent parallels claim 1, except that it claims the selection of a channel "in response to" a generic "triggering event" rather than location.  The remaining claims do not change the analysis and the specifications show that all claimed elements are conventional.[14]

## VII.   NO DISPUTED MATERIAL FACTS PREVENT DISMISSAL

Blackberry's Complaint does not raise material disputes of fact as to whether the patents-in-suit claim an abstract idea.  The Complaint does not contend that the patents-in-suit do not claim "abstract ideas" under step 1 of *Alice*.  Instead, the Complaint argues that the patents satisfy step 2 of *Alice* by pointing to purported problems discussed in the specifications[15] of the patents.  *See* Complaint at ¶¶ 76, 126, 155, 184, 203.  But even if the Court accepts as true the allegations that a patentee thought of a novel solution, the fact that an idea may be "groundbreaking, innovative, or even brilliant" does not satisfy § 101.  *SAP Am., Inc. v. InvestPic, LLC*, 2017-2081, 2018 U.S. App. LEXIS 12590, at *2 (Fed. Cir. May 15, 2018) (internal citations omitted).

The Complaint does not explain why any ***specific*** aspect of the purported inventions was non-conventional.  Rather, it makes conclusory assertions that are simply attorney argument about the technology as a whole, parroting the language of the claims.  *Compare with Aatrix*, 882 F.3d at 1129 (factual issue regarding whether claimed "data file" was conventional); *Berkheimer*, 881 F.3d at 1370 ("one-to-many" editing feature created factual issues).  And "'the court is not required to accept as true legal conclusions couched as factual allegations.'"  *Int'l Designs Corp., LLC v. Hair Art Int'l, Inc.*, Case No. 17-CV-8411, Dkt. 59 (C.D. Cal. Apr.

---

[14] *See, e.g.*, '929 patent, 2:47-50; 7:40-54; 8:35-38; 13:39-43; '351 patent, 1:31-35; 1:39-42; 5:4-16.; *see also* Exhibit A.

[15] Citations to the specifications are unavailing because any purported inventive concept or improvement needs to be captured in the claims themselves, not simply the specification or attorney argument.  *See Berkheimer*, 881 F.3d at 1369.

1  19, 2018) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)) (Exhibit C).

2      As discussed above, the claims of the patents-in-suit invoke only generic,

3  well-known computing elements.  The specifications concede that the patents do not

4  describe concrete improvements to computer or networking technology.  In these

5  circumstances, there are no disputed facts for the Court to resolve.  *See Berkheimer*

6  *v. HP Inc*., 2017-1437, 2018 U.S. App. LEXIS 14388, at *5 (Fed. Cir. May 31,

7  2018) (Moore, J. concurring in denial of petition for rehearing *en banc*) ("In a

8  situation where the specification admits the additional claim elements are well-

9  understood, routine, and conventional, it will be difficult, if not impossible, for a

10  patentee to show a genuine dispute.").

11  **VIII.  THE COMPLAINT INADEQUATELY PLEADS WILLFULNESS AND**
        **PRE-SUIT INDIRECT INFRINGEMENT**

12

13      Blackberry alleges that Snap willfully infringed all six of the asserted patents

14  without alleging any "egregious" conduct by Snap.  But enhancement of damages

15  for willfulness is only allowed as "a 'punitive' or 'vindictive' sanction for egregious

16  infringement behavior."  *Halo Elecs., Inc. v. Pulse Elecs. Inc.*, 136 S. Ct. 1923, 1932

17  (2016).  Courts have required complaints to contain sufficient factual allegations to

18  make it plausible that the defendant engaged in egregious conduct.[16]

19      Blackberry's willfulness claims rest entirely upon its claim that it has given

20  Snap notice of the patents-in-suit.  But even where Blackberry has alleged pre-

21  lawsuit notice of the patents, *see e.g.* Complaint at ¶ 138, it has not pled any facts

22  that could show that Snap's alleged infringement was egregious.  Mere knowledge

23  of the patents-in-suit does not make a defendant's alleged infringement an

24  "egregious case[] of culpable behavior."  *See Halo*, 136 S. Ct. at 1932.  Therefore,

25  [16] *See Emazing Lights, LLC v. De Oca*, No. SACV 15-1561-AG(Ex), 2016 WL

26  7507765, at *2 (C.D. Cal. June 20, 2016); *Telebrands Corp. v. GMC Ware, Inc.*, No.
    CV 15-03121 SJO (JCx), 2016 U.S. Dist. LEXIS 178545, at *22 (C.D. Cal. Apr. 5,

27  2016); *Finjan, Inc. v. Cisco Sys.*, No. 17-cv-00072-BLF, 2017 U.S. Dist. LEXIS
    87657, at *14-15 (N.D. Cal. June 7, 2017).

28

1  the Court should dismiss all of Blackberry's claims for enhanced damages.

2     Additionally, Blackberry does not allege that Snap knew about the Action

3  Spot and Advertising Patents prior to suit.  Courts routinely dismiss willfulness

4  claims where pre-suit knowledge is not alleged.[17]  They have done so because

5  "when a complaint is filed, a patentee must have a good faith basis for alleging

6  willful infringement . . . grounded exclusively in the accused infringer's prefiling

7  conduct."  *Soteria*, 2017 U.S. Dist. LEXIS 193922 at *8.  At a minimum, therefore,

8  the Court must dismiss willfulness on these four patents.

9     In addition, Blackberry's request for pre-suit damages for indirect

10  infringement of the Action Spot and Advertising Patents should be dismissed

11  because the Complaint does not allege pre-suit knowledge of these patents.  *See*

12  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011).  Where, as

13  here, a complaint does not allege pre-suit knowledge of a patent, it fails to state a

14  claim for pre-suit indirect infringement on that patent and should be dismissed.[18]

15  **IX.   <u>CONCLUSION</u>**

16     Snap requests that the Court dismiss all of Blackberry's claims, with

17  prejudice, or alternatively (1) dismiss all claims for willfulness/enhanced damages

18  and (2) pre-suit indirect infringement for the Action Spot and Advertising Patents.

19

20

_____

21  [17] *See, e.g.*, *Soteria Encryption, LLC v. Lenovo U.S., Inc.*, 16-CV-7958, 2017 U.S.

22  Dist. LEXIS 193922, at *8 (Feb. 27, 2017); *Document Security Sys., Inc. v. Seoul*

23  *Semiconductor Co.*, 17-CV-981-JVS, Dkt. 55 at 5 (C.D. Cal. Feb. 5, 2018) (Exhibit

    C); *Wongab Corp. v. Nordstrom, Inc.*, 17-CV-2974-AB, Dkt. 45 at 9 (C.D. Cal.

24  Sept. 21, 2017) (Exhibit C).

25  [18] *See Commer. Copy Innovations, Inc. v. Ricoh Elecs., Inc.*, 17-CV-437-JVS, 2017

26  U.S. Dist. LEXIS 219052, at *13 (C.D. Cal. Oct. 16, 2017); *Windy City Innovations,*

    *LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109, 1116 (N.D. Cal. 2016); *Nanosys,*

27  *Inc. v. QD Vision, Inc.*, No. 16-CV-01957-YGR, 2016 U.S. Dist. LEXIS 126745, at

28  *13-15 (N.D. Cal. Sep. 16, 2016).

1   DATED:  June 7, 2018       PAUL HASTINGS LLP

2

3                        By:     */s/ Yar R. Chaikovsky*

4                           Yar R. Chaikovsky
                              Attorney for Snap Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28