QUINN EMANUEL URQUHART & SULLIVAN, LLP
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

BLACKBERRY CORPORATION
Edward R. McGah, Jr (SBN 97719)
Vice President, Deputy General Counsel – Litigation
41 Ticknor Place
Laguna Niguel, California 92677
Telephone: (+1) 650-581-4750

Attorneys for Plaintiff,
BlackBerry Limited

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation, | ) ) ) |
| Plaintiff, | ) CASE NO. 2:18-cv-02693 ) GW(KSx) |
| v. | ) ) |
| SNAP INC., a Delaware corporation | ) **BLACKBERRY LIMITED'S** ) **OPPOSITION TO** ) **DEFENDANTS' MOTIONS TO** |
| Defendant. | ) **DISMISS** ) ) ) |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

BACKGROUND ...................................................................................... 1

SUMMARY OF THE ARGUMENT ........................................................ 1

LEGAL STANDARD .............................................................................. 4

I.    Defendants Must Meet the Two-Step *Alice* Test by Clear and
      Convincing Evidence in Order To Establish Subject Matter Ineligibility ........ 4

    A.    At *Alice* Step One, Trial Courts Must Carefully Consider Claim
            Language Rather Than Evaluating Patents At A "High Level Of
            Abstraction" ............................................................................. 4

    B.    The Step Two Analysis Involves Fact Questions and Claim
            Construction Issues That Cannot Be Determined On the
            Pleadings ................................................................................. 7

ARGUMENT ............................................................................................ 8

I.    BlackBerry's Patents Claim Eligible Subject Matter ............................. 8

    A.    The Icon Notification Patent Is Patent Eligible ('634 Patent) .............. 10

        1.    Step One: The Icon Notification Patent Discloses an
                  Efficient Solution for Allowing Small-Screen Users To
                  Easily Identify and Navigate to Unread Messages .................... 10

        2.    Step Two: The Icon Notification Patent Provides
                  Notification Information In Non-Conventional, Non-
                  Routine Ways ..................................................................... 13

    B.    Proxy Content Server ('351) ....................................................... 14

        1.    Step One:  The '351 Patent Uses A Proxy Content Server
                  To Deliver User-Friendly Content And Advertisements .......... 14

        2.    Step Two:  The Proxy Content Server Configuration Was
                  Innovative And Non-Conventional ....................................... 18

    C.    Advertising Meta Tags ('929 Patent) ........................................... 18

        1.    Step One:  Meta Tags Deliver Relevant Ads Along With
                  Content ............................................................................ 18

        2.    Step Two:  The '929 Claims Innovative Use of Meta Tags
                  and Content and Advertising Transmission ........................... 20

II.   BlackBerry Has Properly Pleaded Indirect and Willful Infringement .......... 20

    A.    BlackBerry's Has Adequately Pleaded Willful and Indirect
            Infringement Based on Post-Suit Conduct ..................................... 20

III.  CONCLUSION ................................................................................. 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)................................................2, 3, 7, 8, 21

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ....................................................4, 5, 8, 9, 13

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012)...............................................................3

*Berg v. Popham*,
  412 F.3d 1122 (9th Cir. 2005) ................................................................4

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 .............................................................................................4

*Berkheimer v. HP Inc.*,
  881 F.3d 360 (Fed. Cir. 2018) ..............................................2, 7, 9, 20

*Berkheimer v. HP Inc.*,
  890 F.3d 1369 (Fed. Cir. 2018) ...............................................................8

*In re Bilski*,
  545 F.3d 943 (Fed. Cir. 2008) .................................................................3

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed. Cir. 2018)..........................1, 2, 4, 5, 6, 7, 11, 12

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014).........................................1, 5, 6, 9, 17

*Dynamic Digital Depth Research PTY Ltd. v. LG Elecs., Inc.*,
  No. CV 15-5578-GW(Ex), 2016 WL 7444561 (C.D. Cal. June 6, 2016) ....4, 9

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016)........................................................11, 12

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003)...............................................................21

*Enfish, LLC v. Microsoft Corp.*,
  822 F. 3d 1327 (Fed. Cir. 2016)..........................1, 5, 6, 9, 11, 17

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ....................................................................................4

*Immersion Corp. v. Fitbit, Inc.*,
  No. 17-CV-03886-LHK, 2018 WL 1156979 (N.D. Cal. Mar. 5, 2018) ..........7

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
  850 F.3d 1332 (Fed. Cir. 2017)......................................................13, 16

*Local Intelligence, LLC v. HTC Am., Inc.*,
    2018 WL 1697127 (N.D. Cal. Apr. 6, 2018) ...................................................7

*McRo, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed Cir. 2016) ............................................................5, 9, 12

*Shiley, Inc. v. Bentley Labs., Inc.*,
    794 F.2d 1561 (Fed. Cir. 1986) ...................................................................21

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) .....................................................................12

*WCM Indus., Inc. v. IPS Corp.*,
    721 Fed. Appx. 959 (Fed. Cir. 2018) ...........................................................21

**Statutory Authorities**

35 U.S.C. § 101 ........................................................1, 2, 3, 4, 5, 8, 11, 12

35 U.S.C. § 282 .........................................................................................2, 4

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(6) ...........................................................................2, 3

Fed. R. Civ. P. 15(a)(2) ...............................................................................21

**Additional Authorities**

U.S. Patent No. 9,015,285 ..........................................................................16

U.S. Patent No. 9,978,022 ..........................................................................16

## BACKGROUND

Plaintiff BlackBerry Limited ("BlackBerry") opposes separate motions by Facebook and Snap to dismiss as ineligible under 35 U.S.C. Section 101 seven patents asserted by BlackBerry:  U.S. Patent Nos. 8,209,634 (the '634 Patent), 8,301,713 (the '713 Patent), and 9,349,120 (the '120 Patent), 8,825,084 (the '084 Patent), 8,326,327 (the '327 Patent), 8,676,929 (the '929 Patent), and 8,296,351 (the '351 Patent).  BlackBerry further opposes Defendants' motions to dismiss BlackBerry's indirect and willful infringement allegations.[1]

## SUMMARY OF THE ARGUMENT

Defendants' motions to dismiss are ill-founded substantively and procedurally. On the merits, recent Federal Circuit case law has confirmed that the user interface improvements claimed in BlackBerry's patents are patent eligible.  *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018) (improvements to electronic graphical user interfaces (GUIs), particularly those that simplify the display of data and improve the ease of navigation, are patent eligible).  BlackBerry's patents directed to an improved architecture for distributing content and advertising to mobile devices are also patent eligible because they solve a technological problem for electronic devices in a particular and novel way.  *Enfish, LLC v. Microsoft Corp.*, 822 F. 3d 1327, 1338 (Fed. Cir. 2016) (claims "directed to an improvement in the functioning of a computer" are patent eligible.); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (invention "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" patent eligible).

---

[1]  As agreed by the parties, this brief addresses common patents challenged by both Facebook and Snap:  the '634 Patent, the '351 Patent, and the '929 Patent. BlackBerry will file separate briefs addressing issues specific to the separate motions to dismiss filed by Facebook and Snap.

Defendants face a high bar under Section 101:  they must show invalidity by clear and convincing evidence.  *Core Wireless*, 880 F.3d at 1364 (citing 35 U.S.C. § 282).  Defendants fall far short of this burden.  Their cursory treatment of the claim language and entire sets of claims in the challenged patents fails to establish that the challenged claims are abstract.  Their inapt analogies collapse at the barest of scrutiny because they fail to address the actual claimed inventions.  They provide no basis for this Court to find any of the *131* claims patent ineligible under Section 101.

Procedurally, recent Federal Circuit law further compels denial of Defendants' motions.  In *Berkheimer v. HP Inc.*, 881 F.3d 360 (Fed. Cir. 2018), the Federal Circuit confirmed that "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field ***is a question of fact***."  Soon after, in *Aatrix*, the Federal Circuit applied these principles to vacate a district court's grant of a Rule 12(b)(6) motion under Section 101.  *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  Echoing *Berkheimer*, the court held that "patent eligibility can be determined at the Rule 12(b)(6) stage ... only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law."  *Id.* at 1129.  BlackBerry's complaints include concrete factual allegations directly on point to the Section 101 inquiry under *Aatrix*.  For example:

> "The solution implemented by the '929 Patent provides a specific and substantial improvement over prior communication systems used for this purpose, resulting in an improved system for the delivery of relevant and timely content and advertising information to mobile device users. The '929 Patent achieves this result by introducing novel elements directed to improving the function and working of mobile communication systems such as, inter alia, the claimed "a server" (all claims), positioned in a wireless network and configured according to the claims, the capability of the claimed server to detect a "time triggering event" and determine information relevant to the triggering event (all claims), and the capability of inserting into content information corresponding to the time triggering event a meta tag that identifies one or more

advertisements and advertisement display requirements that are selected based on the time triggering event (all claims)."

Dkt. 15 (FAC) at ¶ 327; *see also id.* at ¶¶ 325-330.

BlackBerry dedicated sections of its complaints to describing how the claimed inventions of each patent were not well-understood, routine, or conventional.[2]  Under *Aatrix*, a court cannot ignore these concrete factual allegations concerning the claimed inventions at the pleading stage.  *Aatrix*, 882 F.3d at 1128 (reversing grant of Rule 12(b)(6) motion because, *inter alia*, "There are concrete allegations … that individual elements and the claimed combination are not well-understood, routine, or conventional activity.  There are also concrete allegations regarding the claimed combination's improvement to the functioning of the computer.").

Similar guidance confirms Defendants' motions to dismiss should be denied: "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis."  *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273–74 (Fed. Cir. 2012).  To the extent not denied outright, the Court should at a minimum defer ruling on Defendants' Section 101 claims to enable the Court to have a fully developed factual record and the benefit of a technology tutorial, claim construction and expert opinion on relevant issues.[3]

---

[2]  Dkt. 15 (FAC) at ¶¶ 103-117 ('961 patent), 138-143 ('634 patent), 166-12 ('173 patent), 193-199 ('713 patent), 222-228 ('236 patent), 252-258 ('250 patent), 280-285 ('120 patent), 306-311 ('351 patent), 325-330 ('929 patent); Dkt. 1 (Snap Complaint) at ¶¶ 75-80 ('084 patent), 100-104 ('327 patent), 125-131 ('713 patent), 154-159 ('634 patent), 183-188 ('351 patent), 202-207 ('929 patent).

[3]  For example, claim construction "is an important first step in a § 101 analysis." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008)  As this Court has previously ruled:

It is uncertain what these terms mean and whether such additional claim elements recite any "inventive concept" that would transform a simple application of a law of nature to a patent-eligible application. Without the benefit of claim construction or briefing on these issues, there is insufficient information to make an informed determination on the significance of these recited techniques. Thus, the Court would defer its determination of patent subject matter eligibility….

Finally, Defendants' motions to dismiss BlackBerry's indirect and willful infringement allegations should also be denied.  As detailed below, as well as in BlackBerry's First Amended Complaint against Facebook ("FAC") and BlackBerry's Complaint against Snap ("Snap Complaint") (collectively, the "Complaints"), there have been sufficient facts set forth establishing actual knowledge and egregious conduct by the Defendants as to at least two of the asserted patents.  The willfulness and indirect infringement allegations on the remaining patents are based on ***post-suit*** conduct and, thus, Defendants' motions to dismiss ***pre-suit*** allegations are moot.

## LEGAL STANDARD

Dismissal at the pleading stage is improper if a complaint alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570   In making this determination, a court must accept the allegations of the complaint as true, construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor.  *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007)*; Berg v. Popham*, 412 F.3d 1122, 1125 (9th Cir. 2005).

## I.    Defendants Must Meet the Two-Step *Alice* Test by Clear and Convincing Evidence in Order To Establish Subject Matter Ineligibility

"A patent is presumed valid, and the burden of establishing invalidity of a claim rests on the party asserting invalidity by clear and convincing evidence."  *Core Wireless*, 880 F.3d at 1364 (citing 35 U.S.C. § 282).  Whether a patent is invalid under Section 101 under this standard involves a two-step analysis under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).

### A.    At *Alice* Step One, Trial Courts Must Carefully Consider Claim Language Rather Than Evaluating Patents At A "High Level Of Abstraction"

---

*Dynamic Digital Depth Research PTY Ltd. v. LG Elecs., Inc.*, No. CV 15-5578-GW(Ex), 2016 WL 7444561, at *6 (C.D. Cal. June 6, 2016) (Wu, J.); see also California Institute of Technology v. Broadcom Limited et al., No. 2:16-cv-3714, Dkt. 525 (C.D. Cal. June 6, 2018) (Wu, J.) (explaining decision to delay ruling on Section 101 motion until after technology tutorial and claim construction hearing).

A court first must determine whether the claims as a whole are "directed to a patent-ineligible concept" such as an abstract idea. *Id.* Abstract ideas may not be patented because doing so would preempt entire fields of invention, preemption being "the primary concern driving § 101 jurisprudence." *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed Cir. 2016).

Yet the Supreme Court urges courts to exercise restraint by not classifying as abstract every claim that might possibly be described as such. Rather, courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law." *Alice*, 134 S.Ct. at 2354. As the Federal Circuit has recently warned, courts must be wary of "describing the claims at [] a high level of abstraction and untethered from the language of the claims," because such an approach "all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337; *see McRo*, 837 F.3d at 1313 ("[C]ourts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (internal quotes omitted).

For claims relating to computers and software, recent case law has clarified the application of *Alice* Step One. In the first instance, while the mere recitation of generic computer elements, such as a "microprocessor" or "memory storage," does nothing to save an otherwise abstract idea (*DDR Holdings*, 773 F.3d at 1256 ("[R]ecitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.")), claims that "improve the functioning of the computer itself" or "improv[e] an existing technological process" are not directed to abstract ideas. *Enfish*, 822 F.3d at 1335 (quoting *Alice*, 134 S.Ct. at 2358–59).

The key inquiry, then, is not whether the claim makes use of generic computer elements—virtually all software claims do—but rather whether "the claims are directed to a specific improvement in the capabilities of computing devices." *Core Wireless*, 880 F.3d at 1362. A patent claim is not abstract if the invention "is necessarily rooted in computer technology in order to overcome a problem

specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1257. *Core Wireless* emphasized improvements to displays and navigation ease of electronic communication devices, particularly given the constraints of small screens, 880 F.3d at 1363, whereas *DDR* rejected an eligibility challenge to claims that went beyond using the Internet but claimed "how interactions with the Internet are manipulated to yield a desired result." 773 F.3d at 1258. Similarly, in *Enfish*, the Federal Circuit affirmed the validity of claims that improved the efficiency of data storage, retrieval, and modification. *Enfish*, 822 F.3d at 1332[4].

Of particular relevance here, the Federal Circuit has now confirmed that specific user interface improvements for electronic devices are patent eligible. In *Core Wireless*, the challenged patents claimed an improvement to navigating a mobile device. Whereas the prior art "had many deficits" that forced users to inefficiently spend time scrolling through interfaces, switching views, and drilling down into multiple layers, the claimed invention improved efficiency by providing a central menu from which the user could quickly and easily navigate. *Core Wireless*, 880 F.3d at 1363. The court described the menu as a "specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods

---

[4] A "specific" solution may nonetheless embrace reasonable flexibility. The lack of absolute specificity does not render a claim abstract. For example, the allowed claim in *Core Wireless* called for:

> 1. A computing device comprising a display screen, the computing device being configured to display on the screen a menu listing one or more applications, and additionally being configured to display on the screen an application summary that can be reached directly from the menu, wherein the application summary displays a limited list of data offered within the one or more applications, each of the data in the list being selectable to launch the respective application and enable the selected data to be seen within the respective application, and wherein the application summary is displayed while the one or more applications are in an un-launched state.

*Core Wireless*, 880 F.3d at 1359-60. Among other things, the claim does not limit the number of menu items, or how they are displayed.

to display a generic index," which "improves the efficiency of using the electronic device." *Id.* Thus, the claims were "directed to an improvement in the functioning of computers, particularly those with small screens," and as such were patent-eligible—not an abstract idea. *Id*. at 1363.

Other courts have followed suit. One case involved a patent directed to selecting a subset of services to display on the user interface of a mobile device based on time and location-based cues. *Local Intelligence, LLC v. HTC Am., Inc.*, 2018 WL 1697127, at *1-2 (N.D. Cal. Apr. 6, 2018). The defendant argued the patents were directed toward the abstract idea of "providing communication information based on location and other user information." *Id*. at *6. The court summarily rejected this characterization at step one, holding that under *Core Wireless*, "a specific solution, reciting specific implementation detail, which purports to solve a problem within the technology of user interfaces in electronic devices with small screens, is not abstract." *Id*. at 7-8. Other courts have ruled similarly under the guidance of *Core Wireless*. *See Immersion Corp. v. Fitbit, Inc.*, No. 17-CV-03886-LHK, 2018 WL 1156979, at *15 (N.D. Cal. Mar. 5, 2018) (patent disclosing a specific method for providing notifications via haptic feedback not abstract under *Core Wireless*).

## B. The Step Two Analysis Involves Fact Questions and Claim Construction Issues That Cannot Be Determined On the Pleadings

Even if the moving party shows a claim is directed to an abstract idea, it must also show that it lacks an "inventive concept." Specifically, it must show that the claim involves no more than "well-understood, routine, and conventional activities previously known to the industry." *Aatrix*, 882 F.3d at 1128 (Fed. Cir. 2018) (internal quotations marks and brackets omitted). Whether the claims were well-understood or conventional is a separate test than whether they are invalid over prior art; "[t]he mere fact that something is disclosed in a piece of prior art does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1368-69.

And as previously discussed, the Federal Circuit disfavors resolving the step two inquiry at the pleading stage. *See Berkheimer v. HP Inc.*, 890 F.3d 1369, 1377 (Fed. Cir. 2018) ("*Aatrix* and *Berkheimer* alter the § 101 analysis in a significant and fundamental manner by presenting patent eligibility under § 101 as predominately a question of fact.") (Reyna, J. dissent from denial of petition for rehearing en banc).[5]

## ARGUMENT

### I.   BlackBerry's Patents Claim Eligible Subject Matter

Defendants' motions to dismiss must be denied under controlling law Federal Circuit law.  All that is required at this stage is for BlackBerry to plausibly assert that its patents go to specific technological solutions, such as those that improve the user experience of mobile devices or other improvements to the operation of a computer device or technological process.  BlackBerry has done so.

BlackBerry's patents-in-suit claim graphical user interface improvements that simplify and improve both the display of data and ease of navigation.  They also provide other types of improvements to the functioning of computer devices and technological processes.  In so doing, the patents are directed at patent-eligible concepts.  Moreover, at *Alice* Step Two, even if the Court finds any claims directed to abstract ideas, they recite inventive concepts that were far from routine at the time of BlackBerry's inventions.

In challenging these patents, Defendants ignore recent case law, gloss over BlackBerry's technical innovations and the claim language at issue, and instead offer four primary attacks across the challenged patents.  First, Defendants provide analogies and argue that humans could perform the claimed solutions.  Defendants'

---

[5] In addressing *Alice* step two in their motion, Defendants cite portions of BlackBerry's briefing in an unrelated case—*Maxell*—for the generic proposition that "accused infringers 'do not have to surrender § 101 arguments simply because the claims recite a physical product.'"  (FB Mot. at 17.)  Defendants' citation to this briefing fails to advance their motions.  The proposition is simple black letter law, and not disputed.  *See Alice*, 134 S. Ct. at 2359.

analogies repeatedly fail to capture key elements of the claims and, in any event, the Federal Circuit has now confirmed that a party seeking to invalidate a patent must do more than simply analogize it to human behavior.  "[P]rocesses that automate tasks that humans are capable of performing are patent eligible if properly claimed." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016).

Second, Defendants point out that the asserted claims make use of generic computing elements.  This is true of all software patents, and is irrelevant.  As the Supreme Court and Federal Circuit have made clear, it is no impediment to patent eligibility that a computer-implemented claim makes use of standard tools like memory and CPUs, particularly where the claims are rooted in technological problems.  *Alice*, 134 S. Ct., at 2359; *DDR Holdings*, 773 F.3d at 1256; *Enfish*, 822 F.3d at 1337 ("[T]he first step in the *Alice* inquiry in this case asks whether the focus of the claims is on the specific asserted improvement in computer capabilities.").

Third, Defendants frequently assert that some part of the patent was previously disclosed in the art, but as stated earlier, eligibility and novelty are distinct inquiries: "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art." *Berkheimer*, 881 F.3d 1360 at 1369.

Finally, although it is Defendants' burden to demonstrate that *every asserted claim* is ineligible, Defendants tend to address only one claim per patent, and offer cursory or no treatment to the other claims.[6]  BlackBerry does not concede that any claims are representative and Defendants have not tried to show otherwise.  Defendants' perfunctory or non-existent challenges thus fail.  *Cf. Dynamic Digital*

---

[6] Defendants—with the burden to establish the ineligibility of each claim by clear and convincing evidence—make no effort to distinguish between independent and dependent claims.  The Facebook Defendants summarily dismiss every dependent claim by stating only that each one is "obvious" ('634), that they do not "change the patentability analysis" ('351), or that they add "nothing of substance" ('929).  (FB Br. at 3-5).  Snap merely concludes that the single independent claim they address for each patent "is representative."  (Snap Br. at 18, 19).

*Depth Research PTY Ltd. v. LG Elecs., Inc.*, No. CV 15-5578-GW(EX), 2016 WL 7444561, at *6 (C.D. Cal. June 6, 2016) ("Although Defendants contend in a footnote that there are no meaningful distinctions among the claims, this conclusory assertion is far from clear.").

### A.     The Icon Notification Patent Is Patent Eligible ('634 Patent)

      1.     Step One: The Icon Notification Patent Discloses an Efficient Solution for Allowing Small-Screen Users To Easily Identify and Navigate to Unread Messages

Originally filed in 2003, the '634 Patent addresses a specific technical challenge for wireless communication devices.  Due to the "proliferation of communications available on mobile devices," the patent explains, mobile users receive messages from a litany of separate applications, including "more than one Instant Message-type service, … corporate and personal email." ('634 Patent, at 1:18-22, 53:60.)  Prior systems responded to each incoming message by showing a notification "on a major portion of the main screen," which for mobile users "has a small display area." (*Id.* at 1:38-52.)  The notification was not application-specific, forcing users "to check each of their … applications separately" to determine which application triggered the notification, a process which involves navigating to "a main or home screen and one or more sub-screens that may be navigated from the main screen." (*Id.* at 1:41-43, 60:64.)  This exercise "is inconvenient," leading to "a demand to have information made available to a user quicker than previously available in order to optimize the control of the wireless device." (*Id.* at 1:64-68.)

The '634 Patent presents an elegant solution to this problem—and one only applicable to computers and particularly to wireless communication devices.  When a new message arrives (e.g., an instant message), the invention avoids the need to navigate to multiple applications by modifying an icon associated with a given application "to include a numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread." (*Id.* at claim 1.)

1
2
3
4
5
6
7



Thus, the Icon Notification Patent discloses "a particular manner of summarizing and presenting information in electronic devices," *Core Wireless*, 880 F.3d at 1362, in this case by appending a numeric character that represents the number of correspondents from whom unread messages have been received through that application. '634 Patent at Claim 1. Navigation is improved because the user can tap the appended icon to navigate to the messages. '634 Patent, Claim 4. Other claims detail alternative methods of selectively previewing messages, such as previewing the name of the correspondent (Claim 5) or the message content (Claim 6).

Defendants contend that the claims cover only the "abstract idea of displaying information about unread messages." (FB Br. at 12-14; Snap Br. at 16-19.) But while both Defendants describe the claims as abstractions, neither actually "compare[s] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334; *see id.* at 1337 ("describing the claims at such a high level of abstraction *and untethered from the language of the claims* all but ensures that the exceptions to § 101 swallow the rule") (emphasis added).

Analysis of the claims reveals fundamental differences from those found ineligible. For instance, both Defendants purport to find support in *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). The claims there involved the decades-old matter of "detecting [and displaying] events on an interconnected electric power grid." *Id.* at 1351. This fundamental difference is enough to end any meaningful comparison to the '634 claims, which provide a new way to solve the

computer-specific problem of managing display of incoming messages on a wireless communication device—*i.e.*, they are "directed to a specific improvement in the capabilities of computing devices." *Core Wireless*, 880 F.3d at 1362.   Neither brief even addresses *Core Wireless*, or acknowledges that the '634 Patent improves the graphic user interface of mobile devices by appending a numeric character to an icon that represents the number of correspondents from whom unread messages have been received through that application.

Moreover, the *Electric Power* claims were so broad as to cover virtually every conceivable form of power-grid data analysis[7] and display[8]. *Elec. Power Grp.*, 803 F.3d at 1352.   *See McRO*, 837 F.3d at 1314 (Fed. Cir. 2016) (preemption is "the primary concern driving § 101 jurisprudence").   By contrast, the '634 Patent carries no preemption concerns.   It does not cover the entire realm of "displaying information about unread messages."   In fact, it does not even cover every method of visually modifying an application icon to provide application-specific data about unread messages; each claim requires a "numeric character representing a count of the plurality of different messaging correspondents for which one or more of the electronic messages have been received and remain unread."

Defendants cite other cases as well for their language of abstraction, but again do not compare the claims of those cases to the claims here; in each case, the failed claims recite broad abstract processes that raise major preemption concerns, rather than particular solutions that do not. *See In re TLI Commc'ns LLC Patent Litig.*, 823

---

[7] "[D]etecting and analyzing events ... from the data streams including at least one of frequency instability, voltages, power flows, phase angles, damping, and oscillation modes, derived from the phasor measurements and the other power system data sources in which the metrics are indicative of events, grid stress, and/or grid instability, over the wide area"

[8] "[D]isplaying the event analysis results ... in visuals, tables, charts, or combinations thereof, the data comprising at least one of monitoring data, tracking data, historical data, prediction data, and summary data"

F.3d 607, 610 (Fed. Cir. 2016) (claims covered any form of storing digital images that include any type of "classification information"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1339 (Fed. Cir. 2017) (claims cover the entire area of organizing, displaying, and modifying XML data, not a particular solution).

Facebook's attempted analogy—a paper note reading "two people called: John once and your husband twice"—ignores several computer-specific elements of the '634 claims that are fundamentally different from their purported pen and paper analogs.  The pad of paper does not face the size and navigational restraints that are present in a handheld device.  Thus, while the analogized pad of paper can accommodate a long text string comprising the entire message, the claimed icon shows a numeric character.  It thereby improves the display on a small hand held device, which is not a problem that even exists with a pad of paper. In addition, a static handwritten note, designed in a world with limited incoming messages, is not a dynamic notification on an icon that updates non-intrusively with each incoming message.  That user interface feature, unlike a paper pad, provides a specific improvement to handheld user devices.  Defendants' strained analogy proves only that its motion to dismiss fails at *Alice* Step One.

        2.      Step Two: The Icon Notification Patent Provides Notification Information In Non-Conventional, Non-Routine Ways

The routine operation of prior systems was to provide notifications of incoming messages without identifying the application that received the message.  ('634 Patent, at 1:60-64.)  These notifications occupied a "major portion of the main screen." ('634 Patent, at 1:48-50.)  Such large notifications succeeded in grabbing user attention, but the '634 Patent went against the grain by instead providing a subtle numeric character, appended to an existing icon.  This approach had the advantages of minimal disruption to the user while using less screen real estate.

Facebook argues that the patent does not specify any particular algorithm, but instead "simply describe[s] the end goal of each step—to provide … a message

notification." (Facebook Br. at 19.) This is false. The '634 Patent describes a particular algorithm (calculating the number of people from whom unread messages have been received) and provides the results of that calculation in a particular way (appending a numeric character to an icon).

Snap alleges that the claims may be implemented by "essentially any mobile computing advice," and recites generic elements such as a CPU and keyboard. (Snap Br. at 17.) This assertion misses the mark; virtually *every* software patent recites generic elements and are not invalid for doing so. Snap further argues that *the mere ability* to modify a displayed icon was conventional, but does not argue, much less establish, that to visually modify an icon in this particular context in this particular way was routine or conventional.

### B.   Proxy Content Server ('351)

> #### 1.   Step One: The '351 Patent Uses A Proxy Content Server To Deliver User-Friendly Content And Advertisements

The '351 Patent, originally filed in 2001, is directed to an improved architecture for storing, packaging and delivering content and advertising information to mobile devices. At the time of the invention, an enormous amount of content was available from such sources as World-Wide-Web servers on the Internet. ('351 Patent at 1:32-43.) In general though, those information sources were designed for desktop computers, not mobile devices where bandwidth, battery life and screen size are important. The '351 patent provides a solution to this then-new technological problem by making relevant portions of the existing information sources available to a mobile device over a wireless network.

In particular, the '351 Patent uses a "proxy content server" that gathers information from those information sources, stores the information to particular channels, and selects a particular channel for transmission to a mobile device based on specific feedback received from the mobile device. The proxy content server improves the mobile user experience by efficiently transmitting content and

advertising data together, "so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content." ('351 Patent, at 2:63-66.)  The invention also enables delivery of particular information that the user is likely to be interested in, providing a simplified experience by which the user may receive that information, and employing an efficient data structure for its delivery and storage.

The basic architecture of the '351 Patent begins with a "proxy content server." ('351 Patent at claim 1.)   The proxy content server is a proxy for content that originated on another server—which the patent describes as "Content Servers." ('351 Patent at 2:28:34.)  Examples of content can include sports information, news or instant messages.  (*Id.* at 2:34-40.)   The proxy content server also incorporates advertising information.  (*Id.* at 2:40-45.)  The proxy content server "combin[es] the information so that the mobile device user has a consistent and transparent experience of receiving both information content and advertising content."  (*Id.* at 2:64-3:3.) Because each particular user is interested in only a subset of the information collected by the server, the server "combines the data into packages 20 based on each user's preference, and transmits or pushes the data packets 20 over the wireless network 22 to a mobile device 24."  (*Id.* at 3:10-13; Fig. 1.)  To determine which information should be sent to devices, the server classifies each piece of information into a "channel" or "category" and stores the information in a memory location associated with that channel or category.  ('351 Patent, 3:58-65.)   The server stores both "content" and "advertising" information in the same channel.  (*Id.* at 6:51-54; Fig. 3.) This allows the server to send advertising that matches the content the user wants; for instance, "a company offering financial services may advertise in the stock quotes and financial content channel."  ('351 Patent at 4:23-27.)  The user thus enjoys a seamless experience that blends both advertising and non-advertising content.

The proxy content server minimizes the data sent to the mobile device using "feedback signals" that indicate device location.  Using that signal, the proxy content

server determines the type of content or advertising to package together—and to send that information, rather than unfiltered information, to the device.  For example, each channel at the server may correspond to "a category of information that the user may, or may not, be interested in receiving at her mobile device 24 at a given point in time or at a particular geographic location." ('351 Patent at 4:39-46.)  When the server receives a signal such as the location of the device or other "triggering" event, it "determines if the content information or advertising information category assigned a particular channel 21 is relevant." (*Id.* at 4:39-46, 12:54-58.)  Because the content is carefully selected and filtered before delivery to the user, the small-screen mobile device is not overwhelmed by a flood of unfiltered information from the Internet.

Finally, the '351 Patent claims a specific technique to implement this invention, using three separate categories of advertising information:  static information, which typically does not need to change, such as a company logo; default information, which typically rarely changes, such as a price list or menu; and dynamic information, which typically frequently changes, such as a temporary sale offer. ('351 Patent at 7:35-49.) This can allow for selective transmission of only certain parts and thereby cut down on data transmission and battery usage.

Defendants cite to *Affinity Labs*, *Intellectual Ventures* and similar cases in support of their basic argument—that the claimed invention of the '351 Patent is merely providing tailored content based on information known about the user. (Facebook Br. at 7-12, Snap Br. at 19-23.)[9]  Defendants are wrong: the '351 Patent provides a new solution for ***how*** content and advertising information are efficiently maintained (at a proxy content server), packaged (using default, static, and dynamic

---

[9]  Of note, Defendants themselves have filed and successfully gained patents with similar concepts.  *See, e.g.* Facebook U.S. Patent No. 9,978,022 (deciding what content to show based in part on a user's "location" and "social information"); Snap U.S. Patent No. 9,015,285 (showing media items to users based on "geolocation and position information of the mobile device").

information) and sent to a mobile device after a feedback signal indicating location. This distinction is critical as it underlines why "the claims here are directed to an improvement in the functioning of a computer" and thus are patent eligible. *Enfish*, 822 F. 3d at 1338. The invention further minimizes the amount of data sent to a mobile device and create a better experience for mobile device users trying to effectively consume information from around the Internet, on its face a problem "particular to the internet." *DDR Holdings*, 773 F.3d at 1247. This Court should reject Defendants' attempts to gloss over the technical details on these implementations.

For instance, Facebook analogizes the '351 Patent to an information kiosk. (Facebook Br. at 10.) The analogy fails. Kiosks do not have "proxy content servers" or "feedback signals" that indicate the location of a mobile device at a different location; both are required by the claims. A kiosk cannot select a channel and provide different types of advertising or content based on a mobile device's location. Critically, the analogy does not at all capture the intrinsically mobile device related problem solved by the '351 Patent. Facebook's kiosk attendant indiscriminately passes out flyers, which is exactly what the patents are designed to ***avoid***, because in the Internet realm, indiscriminate sending of aggregated Internet content would both overwhelm the user and waste resources including bandwidth and mobile battery and computing power. There is also no special architecture employed by a kiosk attendant, who passes out flyers with no regard to compiling advertisements based on a combination of "dynamic," "default," and "static" advertising information.

Snap's cursory analogy similarly fails. It argues that both patents cover only the idea of "sending information provided to a consumer based on information about the consumer," comparing the patents to junk mail. (Snap Br. at 20-21.) This facile comparison ignores the claim language, the specification and the claimed invention. It does not address how the claims of the '351 patent provide a new solution for ***how*** to aggregate content and advertising and efficiently package it for mobile devices.

2.      Step Two:  The Proxy Content Server Configuration Was Innovative And Non-Conventional

As BlackBerry pleaded:  "The inventors of the '351 Patent recognized the need to transmit targeted advertising, facilitated by a proxy content server, in order to deliver relevant and timely advertising information to mobile users."  (FAC ¶ 307; Snap Complaint ¶ 184.)  The patent discloses "an unconventional and technological solution to an issue arising specifically in the context of wireless communication devices, and the delivery of advertising content to such devices."  (FAC ¶ 308; Snap Complaint ¶ 185.)  Unique elements include the specific architecture of the proxy server, which aggregated content from disparate sources, grouped both advertising and content information within specific channels, and could respond to signals such as signals indicating device location to select content, ads or a combination of both to deliver relevant content to the user.  (FAC ¶ 306-08; Snap Complaint ¶ 183-85.)  The patent also claims a specific solution that splits advertisements into static, default, and dynamic components ('351 Patent, all claims), which permits the system where appropriate to cut down on transmission and battery costs.

Neither Snap nor Facebook presents any argument as to the patent's method of splitting advertisements into three parts.  Nor do they address the specifics of the server- and device-side architectures that drive the system.  Instead, Facebook glosses over every detail of technical implementation and asserts that the patent merely "describe[s] the end goal of … provid[ing] advertising."  (Facebook Br. at 18-19.)  This is false:  As stated in the claims themselves, the patent describes an innovative technical architecture which drives a specific and intelligent way of providing both advertising and non-advertising to interested mobile device users, which not only does work for the users by selecting the information to send, but further sends that information within the engineering constraint of minimizing bandwidth.

**C.    Advertising Meta Tags ('929 Patent)**

1.      Step One:  Meta Tags Deliver Relevant Ads Along With Content

The '929 Patent uses the same fundamental architecture as the '351 Patent, but includes additional functionality that enables the wireless mobile device to display ads with reduced screen real estate and reduced delay or bandwidth consumption:  an advertising "meta tag" sent by the server to the device.  ('929 Patent at Abstract.)  That is, like the '351 patent, it is a solution designed to solve a problem specifically arising in sending information to wireless devices.  Specifically, once the proxy server detects a "triggering event" relating to time, it checks to see whether a device is interested in receiving information relating to that trigger.  (*Id.* at 11:45-66; Claim 1.)  If the server concludes that the content should be sent to the mobile device, the server may embed "meta tags" into the content.  (*Id.* at 11:66-12:16.)  One example from the '951 Patent specification: "Meta tags are embedded control sequences that the Proxy Content Server has inserted to indicate when advertising should be inserted." (*Id.* at 8:32-35.)  This meta tag is served along with content and consumes little data because, for example, it can include "a cross reference value to reach the full advertising on the mobile device." (*Id.* at 12:11-15.)  That is, rather than necessarily sending the full advertisement, the patent describes sending an embedded control sequence that references the full advertisement to be later pulled by the user.

Facebook asserts the same kiosk analogy as against the '351, which fails for the same reasons.  (Facebook Br. at 10-11.)  Moreover, Facebook presents no "placeholder" that can be analogized to a meta tag.  Facebook's statement that the "meta tag merely identifies the content being sent (like a post-it note saying 'this one')" is also incorrect.  (Facebook Br. at 11.)  In fact, the meta tag does not identify the *content*, but rather identifies the associated *advertisement*.  That is a key feature of the meta tag, recited in all the claims of the '929: "a meta tag for one or more advertisements to be displayed with the content information."  As described, the claimed meta tag and its operation within the '929 Patent are aimed at a problem rooted in mobile device technology.  Facebook simply ignores it.

### 2. Step Two: The '929 Claims Innovative Use of Meta Tags and Content and Advertising Transmission

BlackBerry's use of time-based triggers in combination with meta tags to embed targeted advertising into displayed content improved existing mobile device systems. Snap argues that BlackBerry did not invent meta tags (Snap Br. at 21-22) confusing the question of novelty with that of patent eligibility. Regardless, Snap's argument seeks to analyze the meta tag in a vacuum, entirely divorced from its role in the claimed invention. The meta tag is embedded within content information and packaged to a mobile device based on a feedback signal, a process which was not routine or conventional.

Facebook does not mention meta tags within its Step 2 analysis, merely stating that "systems for pushing information" were known (Facebook Br. at 17), a point which does not affect the patent eligibility of these claims. And even if meta tags or any other element of the '929 Patent was previously known, that does not mean they are "conventional" or "routine" for step two purposes. *Berkheimer*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional."). Thus at the very least—particularly given that the term "meta tag" has not yet been construed—a fact issue remains as to whether BlackBerry's particular implementation of advertising meta tags served along with non-advertising content in response to a triggering event is an "inventive concept."

## II.   BlackBerry Has Properly Pleaded Indirect and Willful Infringement

### A.   BlackBerry's Has Adequately Pleaded Willful and Indirect Infringement Based on Post-Suit Conduct

As to the '351, '713, '236, '929, '250, '173, and '120 Patents in the FAC and the '327, '084, '351, and '929 Patents in the Snap Complaint, BlackBerry only alleges knowledge by Defendants "at least as early as the filing and/or service of this Complaint" and, as such, only accuse post-suit conduct. Accordingly, Defendants' motions to dismiss allegations of pre-suit willfulness and pre-suit indirect

infringement on these patents should be denied as moot.

There is no "per se rule" that a finding of willful infringement requires pre-suit knowledge of the patent. *WCM Indus., Inc. v. IPS Corp.*, 721 Fed. Appx. 959, 970 (Fed. Cir. 2018). In *WCM*, though the Federal Circuit ultimately upheld the verdict of willfulness based on evidence of defendant's pre-suit knowledge, it nevertheless explained that there is no "per se rule" requiring pre-suit knowledge for a finding of willfulness but that willfulness should be considered based on the "totality of the circumstances presented in the case." *Id.* (citing *Shiley, Inc. v. Bentley Labs., Inc.*, 794 F.2d 1561, 1568 (Fed. Cir. 1986)); *see also ACCO Brands, Inc. v. PC Guardian Anti-Theft Prods., Inc.*, 592 F. Supp. 2d 1208, 1227 (N.D. Cal. 2008). Based on this understanding, and considering the totality of the circumstances between the parties, there should similarly be no "per se rule" barring allegations of post-suit willfulness at the pleading stage where, as here, the facts show the parties were in engaged in patent licensing discussions but Defendants made no attempt to avoid infringement.

Alternatively, to the extent the Court deems BlackBerry's FAC to allege pre-suit willful and indirect infringement on the '351, '713, '236, '929, '250, '173, and '120 Patents and the Snap Complaint to allege pre-suit willful and indirect infringement on the '327, '084, '351, and '929 Patents, and should the Court determine that post-filing willful infringement allegations may not be maintained, then BlackBerry respectfully requests that any such claims be dismissed without prejudice pending further discovery into Defendants' knowledge and actions.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motions to dismiss should be denied.[10]

---

[10]  If the Court grants any part of Defendants' motions, BlackBerry respectfully requests leave to amend. A "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). In the Ninth Circuit, "there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *see Aatrix*, 882 F.3d at 1125 (Fed. Cir. 2018) (district court erred denying leave to amend).

1  DATED:  June 28, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully Submitted,

QUINN EMANUEL URQUHART  &
SULLIVAN, LLP


By /s/ *James R. Asperger*
　　James R. Asperger (Bar No. 83188)
　　jamesasperger@quinnemanuel.com
　　865 S. Figueroa St., 10th Floor
　　Los Angeles, CA 90017
　　Telephone: (213) 443-3000
　　Facsimile: (213) 443-3100

　　Kevin P.B. Johnson (Bar No. 177129)
　　kevinjohnson@quinnemanuel.com
　　555 Twin Dolphin Drive, 5th Floor
　　Redwood Shores, CA 94065
　　Telephone: (650) 801-5000
　　Facsimile: (650) 801-5100

　　BLACKBERRY CORPORATION
　　Edward R. McGah, Jr (SBN 97719)
　　Vice President, Deputy General Counsel
　　– Litigation
　　41 Ticknor Place
　　Laguna Niguel, California 92677
　　Office: (+1) 650-581-4750

　　Attorneys for Plaintiff, BlackBerry Limited