1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
2    James R. Asperger (Bar No. 83188)
     jamesasperger@quinnemanuel.com
3    865 S. Figueroa St., 10th Floor
     Los Angeles, CA 90017
4    Telephone: (213) 443-3000
     Facsimile: (213) 443-3100
5
6    Kevin P.B. Johnson (Bar No. 177129)
     kevinjohnson@quinnemanuel.com
7    555 Twin Dolphin Drive, 5th Floor
     Redwood Shores, CA 94065
8    Telephone: (650) 801-5000
     Facsimile: (650) 801-5100
9
10 BLACKBERRY CORPORATION
     Edward R. McGah, Jr (SBN 97719)
11   Vice President, Deputy General Counsel – Litigation
     41 Ticknor Place
12   Laguna Niguel, California 92677
     Telephone: (+1) 650-581-4750
13
14 Attorneys for Plaintiff,
   BlackBerry Limited
15
16              IN THE UNITED STATES DISTRICT COURT
17             FOR THE CENTRAL DISTRICT OF CALIFORNIA
18
19 BLACKBERRY LIMITED, a        )
   Canadian corporation,        )
20                              )
            Plaintiff,          )   CASE NO. 2:18-cv-02693 GW(KSx)
21                              )
        v.                      )   **BLACKBERRY LIMITED'S**
22                              )   **OPPOSITION TO**
   SNAP INC., a Delaware corporation )   **DEFENDANT'S MOTION TO**
23                              )   **DISMISS**
            Defendant.         )
24                              )
25                              )
                                )
26                              )
27
28

## BACKGROUND

Plaintiff BlackBerry Limited ("BlackBerry") hereby submits this opposition brief to Defendant Snap's motion to dismiss pertaining to the issues specific to Snap's motion:   eligibility under 35 U.S.C. Section 101 of U.S. Patent Nos. 8,209,634 (the '634 Patent), 8,301,713 (the '713 Patent), 8,825,084 (the '084 Patent), 8,326,327 (the '327 Patent), 8,676,929 (the '929 Patent), and 8,296,351 (the '351 Patent), and BlackBerry's indirect and willful infringement allegations.[1]

## ARGUMENT

### I.   BlackBerry's Patents Claim Eligible Subject Matter

#### A.   Intelligent Time Stamping ('713 Patent)

##### 1.   Step One:  Intelligent Timestamping Uses A Specific Rule To Improve Electronic Instant Messaging User Interfaces

The '713 Patent addresses a specific challenge arising from the sometimes-overwhelming amount of incoming information that must be conveyed to a user within the limited screen space available in a mobile device.  In the field of instant messaging, conversations often occur at a quick conversational pace, and because mobile devices "are relatively small" ('713 Patent, at 1:27-36), engineers must optimize the information that is presented to the user.  One such challenge relates to time stamps indicating the time of transmission of messages.  As the patent explains:

> *If the conversation continues quickly, i.e., substantially without interruption, the messages do not need a time stamp on them.* In the environment of a handheld electronic device, it would be desirable to avoid unnecessary time stamps and other unnecessary output since it occupies too much valuable space on the limited display of the handheld electronic device.

> *In some messaging circumstances, however, it may be desirable for information regarding certain timing aspects of conversation to be*

[1]   BlackBerry addresses issues common to Snap's motion to dismiss and to a contemporaneously-filed motion by Facebook and its subsidiaries in a related case in its Opposition to Defendants' Motions to Dismiss (Dkt. 38 ("Common Brief").)

1
2
3
4

> *available to a user.* Nevertheless, the limited space available on a display of a handheld electronic device has made a solution difficult. It thus would be desirable to provide an improved handheld electronic device and an associated method that provide time data in a messaging environment.

5
6
7
8
9
10
11
12
13
14
15

('713 Patent at 1:54:67.)  The '713 Patent proposes an intelligent solution to this challenge rooted in user interfaces for mobile devices.  Within the instant messaging interface, a timestamp is displayed only after "a predetermined duration of time has elapsed" between communications.   ('713 Patent, claim 1.)   For example, a timestamp could be set to appear only next to a message sent at least five minutes after the previous message.  Selective display of time stamp information to optimize the use of space in an instant-messaging application is "a specific manner of displaying a limited set of information to the user," and is "a specific improvement over prior systems, resulting in an improved user interface for electronic devices." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018).

16
17
18
19
20
21
22

   Snap argues that the '713 patent is "directed to the abstract idea of time stamping," but this distillation ignores the key concept of the patent:  making a specific improvement to the way that time stamp information is displayed in an electronic conversation on a computer, specifically by displaying a timestamp when the user is most likely to be interested in one, rather than never displaying a timestamp (which under-informs users) and displaying a timestamp with each message (which unduly takes up valuable screen real estate and annoys users).

23
24
25
26
27
28

   Likewise, Snap's argument that the '713 Patent improperly preempts all usage of time stamps because the predetermined duration of time "could be set at any duration of time" is mistaken.  (Snap Br. at 5.)  Ready alternatives to the '713 Patent include always showing timestamps or showing time stamps only upon user request.  Put simply, if a messaging application uses time stamps without a determination of whether a "predetermined duration of time has elapsed," there is no infringement,

and thus no preemption concern.  Snap also misses the mark by analogizing the claims at issue to a company that time stamps a late-paid bill.  (Snap Br. at 4.) There is only one time stamp on a bill, and no space constraints to solve for. Selectively displaying time stamps in a messaging window to simplify a graphical user interface is not analogous to stamping a monthly bill by hand because it is late.

Snap's citation to *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) is also unavailing.  There, the claims recited a "post office for receiving and redistributing email messages on a computer network," in which the post office would (i) receive a message, (ii) apply one or most unnamed "business rules" to the message, and (iii) deliver the message somewhere based on application of the rule, and log the rule that was applied.  *Id.* at 1316-17.  The claims never described any particular rule.  For the '713 Patent claims to be analogous to *Symantec*, they would have had to similarly claim:  "(i) receive a message, (ii) apply one or more rules to the message, (iii) display the message in accordance with application of those rules."  The '713 Patent is not nearly so broad and abstract.  It calls for a particular rule (determining whether the time between communications exceeds a threshold) and a particular action if the rule is applicable (displaying a time stamp).  Doing so "saves space of the display," ('713 Patent, at 6:6:7), and thus is "directed to an improvement in the functioning of computers, particularly those with small screens."  *Core Wireless*, 880 F.3d at 1363.  As to the nine dependent claims, Snap provides only the conclusory assertion that these nine claims are "directed to basic communication concepts and the location of the time stamp, which are all conventional."  (Snap Motion at 7-8.)  These claims include additional non-abstract concepts, such as a "resumption message."  Snap's passing reference to the dependent claims falls far short of its burden.

> 2.   Step Two:  The Patent Displays Messaging Timestamps In A Non-Routine, Unconventional Manner

1    BlackBerry alleged that the selective display of time stamps improved upon
2    existing systems in which "timestamps were typically displayed for every message
3    in a conversation or not at all."  (Complaint, Dkt. 1 ("Snap Complaint") ¶ 127.)  The
4    '713 Patent provided a "specific and substantial improvement over prior electronic
5    messaging systems" by displaying a time stamp only after a "predetermined
6    duration of time has elapsed" between messages.  (Snap Complaint ¶ 128.)  These
7    allegations alone suffice to require denial of Defendant's motion to dismiss:  on
8    their face they set forth well-pleaded facts establishing that the use of a selective
9    timing mechanism was an inventive concept.[2]  Even Snap admits that applying time
10   stamps selectively represents a "possible 'invention'."  (Snap Br. at 3.)

11   Again, Snap's argument that the claims include conventional elements such as
12   a display, memory, and processor (Snap Br. at 6) have no bearing on the Section 101
13   analysis.  Snap does not contest, much less refute in the light most favorable to
14   BlackBerry, the allegations in BlackBerry's Complaints that the '713 Patent takes
15   the non-conventional approach of *selectively* displaying timestamps after a
16   predetermined period of time has elapsed, in contrast to conventional methods of
17   existing systems which displayed timestamps "for every message in a conversation
18   or not at all."  (Snap Complaint ¶ 127.)  No more is needed at this stage.

19   Finally, Defendant argues that the claims of the '713 Patent are "so abstract
20   and sweeping as to cover *any and all* uses of a time stamp for an electronic
21   message."  (Snap Br. at 5.)  In so doing, Snap once more provides its own inaccurate
22   interpretation of the claim language, and ignores the "predetermined duration of
23   time" limitation.  This is a telling example of one of the many claim limitations that,
24   properly construed, supply the patent's inventive concepts.

---

26   [2]  Snap also argued that this selective display is that the claim "does not limit the
27   format of the time stamp," but this attack fails.  As described in the Common Brief,
     n. 4, the eligibility determination freely allows for reasonable flexibility within the
28   parameters set by the invention.

## B.   The Action Spots Patents ('084 and '327)

1.   Step One:  The Action Spots Patents Replace Tedious Navigation Through Multiple Applications With a Single United Display Showing Aggregated Social Media Data

Prior to the '084 and '327 Patents (collectively, the "Action Spots Patents"), the process of identifying and locating nearby events on a mobile device was tedious and inefficient.  As the '084 Patent explains, existing digital maps did not display nearby events, but instead were typically "limited to displaying the streets within a city." ('084 Patent, at 3:6-11.)[3]  Thus, to find a nearby activity of interest, users had to "search an external resource, such as an electronic events calendar, internet sites, internet calendars of individual business or event holders (stores, restaurants, concert venues, bars, etc.), and compare the locations of the found events and happenings to the mobile device's current location."  (*Id*. at 3:11-19.)  This process made for a poor user experience on mobile devices:

> Such a process of manually researching events and happenings, determining the location of the events and happenings, and comparing the location of the events and happenings to the user's current location is tedious and results in **user frustration**. Moreover, the results of the user's research of current events and happenings can be **incomplete and inaccurate**, and the user can **miss certain happenings** that are close in proximity to the current location of the user's mobile device.

(*Id*. at 3:19-27.)

The Action Spots Patents take a different and novel approach.  They take advantage of newly-available data sources—a user's location and the digital activity of those nearby—to improve the usability of the digital device itself by creating a dynamic digital map, allowing the user to easily locate and navigate to events of

---

[3]   This brief cites to the '084 patent.  While the claims of the '327 Patent differ from those of the '084, the patents do share a specification and corresponding disclosures.  As discussed further below, Defendants completely fail to distinguish between the independent and dependent claims of each of the '084 and '327 Patents, and do not distinguish between the claims of the '084 and '327 Patents at all.

1  interest within a predetermined distance from the location of their mobile device.

2      Unlike traditional methods that required users to reference one or more static

3  listings of events, the Action Spots Patents introduced, and are premised on, an

4  entirely new concept called the "action spot," which leverages the behavior of other

5  Internet-enabled smartphones to create a proxy for nearby events of interest.  The

6  concept begins with the term "activity," which as used in the Action Spots Patents

7  "refers to an action taken by a mobile device" associated with a location, such as

8  "text messaging, emailing, blogging, [or] posting a message on a social networking

9  internet site," or "video recording, audio recording, or photographing taken by a

10 mobile device."  ('084 Patent at 2:61-3:5.)  An "action spot" is thereby defined as a

11 location where such activity of a mobile device is taking place, and is thus a

12 technical implementation made possible by location-aware mobile devices sharing

13 their own actions though an interconnected network.  (*Id.*)  The action spots further

14 display an indication of "activity level," providing a new way for users to know

15 where the most activity is happening around them.  The action spots are displayed

16 on a graphical interface such as a map; the user's location is also displayed, which

17 allows the user to easily navigate to the action spots.  (*Id.* at 4:32-53, 5:39-41.)  *See*

18 *Core Wireless*, 880 F.3d at 1363 (claim patent-eligible that improves the "speed of a

19 user's navigation through various views and windows" by relieving the need to

20 "pag[e] through multiple screens of options"); *DDR Holdings, LLC v. Hotels.com,*

21 *L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014) (claims eligible that "specify how

22 interactions with the Internet are manipulated to yield a desired result").

23      Snap argues that the Action Spots Patents are "directed to the conventional

24 and abstract concept of locating and mapping activity," and points to prior examples

25 such as maps of seismic activity, crime maps, or traffic maps.  (Snap Br. at 9.)  At

26 bottom, these are arguments directed at novelty, not evidence in support of lack of

27 subject matter eligibility.  Even considered, the analogies again fall flat because they

28 ignore the claimed inventions:  leveraging the at-the-time newfound phenomenon of

mobile devices that take pictures, send messages, and post to social media, to create through a novel process a live, real-time display of nearby events of interest.

Snap suggests incorrectly that "none of the claims provides detail on how to implement the invention." (Snap Br. at 10.) This is false. Claim 1 of the '327 Patent explicitly states that an "action spot" corresponds to a location where another mobile device has engaged in "documenting action" such as "text messaging, emailing, blogging, posting a message on a social networking internet site, or any other documenting actions." ('327 Patent, at 2:55-58.) Claim 1 of the '084 Patent provides an alternative but equally detailed set of instructions, requiring transmission of data about an "action spot" defined by "at least one of [a second mobile device] capturing images, capturing videos and transmitting messages." The novel "action spot" replaces the former, tedious process by which users seeking local events would have to "pag[e] through multiple screens of options," and instead offers a single, unified view through which "a user's navigation through various views and windows can be improved." *Core Wireless*, 880 F.3d at 1363.

> 2.  Step Two: The Action Spot Is a Unique, Non-Conventional Proxy for Identifying and Displaying Nearby Events of Interest

As alleged in BlackBerry's Complaint, "[a]t the time of the '084 Patent, mobile device maps and directions were static and lacked dynamic information relating to the surrounding location of a user." (Snap Complaint, at ¶ 77.) The Action Spots Patents provided a unique and dynamic improvement. (*Id*. at ¶¶ 77-79.) As discussed above, whereas individuals used to locate events of interest by looking at a series of static listings, the patents distill the combined actions of mobile devices into a dynamic, real-time activity monitoring system. (*Id*. at ¶¶ 76-77.) Moreover, rather than displaying a static map, the patents disclose a dynamic map whose display shifts to echo the locations of nearby activity.

Snap argues that the patents use "conventional and well-known technology" (Snap Br. at 12), again falling into arguments concerning novelty not applicable to a

motion to dismiss under Section 101.  Regardless, the salient fact is that there was nothing "well-known" about the claimed action spots.  (Snap Complaint, at ¶¶ 78, 104.)

Snap further charges that "the patent specification states that determining action spots could be done manually."  (Snap Br. at 14.)  Again this reads the innovation out of the claims.  The '084 Patent explained that previous manual methods of finding local activities were "tedious and result[] in user frustration," and further could be "incomplete and inaccurate," causing the user to "miss certain happenings that are close in proximity to the current location of the user's mobile device."  ('084 Patent, at 3:19-27.)  The Action Spot Patents, in contrast, aggregate social media activity into "action spots" on a map, showing levels of activity within a certain distance from a mobile device and facilitating the discovery of ongoing events at particular locations.  Action spots therefore ***replaced*** the prior process of searching disparate and out-of-date sources in a unique, digitally-enabled way.

### 3. Defendant Does Not Meaningfully Address the Dependent Claims of the '084 and '327 Patents

Finally, Defendant's motion should be denied as to the seventeen dependent claims of the '327 Patent and every claim of the '084 Patent because Defendant make no effort to establish the ineligibility of these claims by clear and convincing evidence.  Defendant suggests that claim 1 of the '327 Patent is representative of every other claim of the '327 ***and*** every claim of the '084 Patent.  BlackBerry disputes that these claims are representative.  In support of this sweeping claim, Defendant proffers nothing more than the unsubstantiated assertion that claim 1 "is representative" of the '327 Patent and that "[t]he '084 Patent is a continuation of the '327 Patent and they have substantively identical written specifications and figures and similar claims."  (Snap Mot. at 8.)  Snap also concludes that every dependent claim of the '327 Patent recites "conventional and well-understood" techniques.  (*Id.* at 15.)  Snap does not even address any claim of the '084 Patent.

As it did with the '713 Patent, Snap attacks the "predetermined distance" and "predetermined period of time" limitations of the '084 and '327 Patents' claims by construing them so broadly that they "could literally be anything." (Snap Motion at 14.) These arguments do nothing but draw attention to potential claim construction issues that appear to be in dispute. Snap must impose these broad constructions on the claims in order to fit its preferred narrative. These claims, when properly construed, contribute to the inventive concepts of the '084 and '327 Patents.

## II.   BlackBerry Has Properly Pleaded Indirect and Willful Infringement

### A.   The Pleaded Facts Show Snap's Knowledge of the '713 and '634 Patents and Subsequent Egregious Conduct

The Snap Complaint sets forth sufficient well-pleaded facts to show actual knowledge of the '713 and '634 Patents—which Snap does not dispute—as well as egregiousness in its failure to conduct a reasonable investigation in view of BlackBerry's notice of infringement, and its continuing infringement for more than a year following such notice. (Snap Complaint, ¶¶ 7, 138, 167.) Accordingly, the Snap Complaint sets forth facts comparable to those found sufficient by this Court in *International Designs*, where "the FAC provide[d] both allegations of knowledge of the [asserted patent] and allegations that Defendant continued selling its product despite an 'unjustifiably high risk of infringement.'" *Int'l Designs Corp., LLC, et al. v. Hair Art Int'l, Inc.*, Case No. CV 17-8411-GW(PJWx), Dkt. 59 at 4 (C.D. Cal. Apr. 19, 2018); *see also Blitzsafe Texas, LLC v. Volkswagen Group of Am., Inc.*, No. 2:15-cv-1274, 2016 WL 4778699, *7 (E.D. Tex. Aug. 19, 2016); *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 2016 WL 3365437 at *10 (N.D.N.Y. 2016) (post-*Halo*, applying *Read Corp. v. Portec, Inc.*, 970 F.3d 816, 826-27 (Fed. Cir. 1992) in upholding a jury's finding of willfulness in part because "[Defendant] failed to stop its infringement after [Plaintiff] commenced the lawsuit").

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied.

DATED:  June 28, 2018        Respectfully Submitted,

QUINN EMANUEL URQUHART  &
SULLIVAN, LLP


By/s/ *James R. Asperger*
   James R. Asperger (Bar No. 83188)
   jamesasperger@quinnemanuel.com
   865 S. Figueroa St., 10th Floor
   Los Angeles, CA 90017
   Telephone: (213) 443-3000
   Facsimile: (213) 443-3100

   Kevin P.B. Johnson (Bar No. 177129)
   kevinjohnson@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
   Redwood Shores, CA 94065
   Telephone: (650) 801-5000
   Facsimile: (650) 801-5100

   BLACKBERRY CORPORATION
   Edward R. McGah, Jr (SBN 97719)
   Vice President, Deputy General Counsel
– Litigation
   41 Ticknor Place
   Laguna Niguel, California 92677
   Office: (+1) 650-581-4750

Attorneys for Plaintiff, BlackBerry Limited